# SUPREME COURT

#### OF

# ILLINOIS.

## THIRD GRAND DIVISION.

### APRIL TERM, 1865.

WILLIAM LUNN *et al.*

*v.*

GEORGE W. GAGE.

37 19
62a 99

37 19
82a 183

37 19
213 ²533
213 ²534

1. LEASE—*covenants for repairs—how construed.* Where a lessor, for a term of five years, covenants to paint the building, to erect a stable, and lay a side track leading to a cattle yard, connected with the hotel, and no time is specified when such repairs shall be made, the law will presume that it was to be done for the benefit of the lessee, and in a reasonable time.

2. COVENANTS—*construction.* The true rule of construing covenants, is to hold them dependent or independent, according to the intention of the parties. And where a covenant seems to be dependent, if the parties act under it so as to render it clear that they regarded them as independent, such action affords a means of ascertaining their intention, when they were entered into by the parties.

3. RENTS—*recovery of, and recoupment of damages.* Where a tenant entered into possession, under such a lease, and occupied the premises for several months, and the landlord failed to make the repairs, the tenant, after abandoning the occupancy of the property, will be liable for the rents for the time, .

at the rate agreed upon ; but if he has suffered loss by reason of the land-lord failing to repair, in a reasonable time, the tenant may recoup such damages against the rents.

APPEAL from the Superior Court of Chicago.

This was an action of covenant brought by George W. Gage, in the Superior Court of Chicago, against William Lunn and William H. Lunn, for the recovery of rent claimed to be due, under a lease, for a hotel and its appurtenances in Chicago. The plaintiff counted upon a lease given by plaintiff to defendants, which contained in substance these provisions :

" To have and to hold the said above described premises, with the appurtenances, unto the said parties of the second part, their executors, administrators and assigns, from the 1st day of April, A. D. 1861, for and during and until the 1st day of April, A. D. 1866. And the said defendants cove-nanted and agreed therein, with the said plaintiff, to pay him as rent for the said premises, the sum of one thousand dollars per year, in quarterly installments.

"And it was, and is further covenanted and agreed, in and by said indenture, that in case said defendants should keep and retain the said premises, for and during the said term, to wit: from the said 1st day of April, A. D. 1861, to the 1st day of April, A. D. 1866, that then, and in that case, the rent of said premises, so leased, should not commence until the 1st day of September, A. D. 1861; but that in case the said defendants should vacate the said premises on or before the 1st day of April, A. D. 1862, that then, and in that case, the rent of said premises was to commence on the 1st day of April, A. D. 1861, at the said rate of one thousand dollars per year."

It is averred that defendants left the premises before the 1st day of April, 1862, to wit: on or about the 15th day of November, 1861. And that, by means of their covenants, defendants became liable to pay plaintiff rent on the premises

from the 1st day of April, 1861, until the 15th day of November, 1861. And that the defendants, and each of them, have neglected to pay the rent, or any part thereof, to the plaintiff.

To the plaintiff's declaration, the plea of *non est factum* was filed; and a stipulation was entered into by the parties, that the defendants might, under the above plea, make all and each of the defenses and objections they could have done, if they had craved oyer, and set out said indenture of lease, and plead to the same; and also that upon the trial said defendants might, under the above plea, give any evidence which they could give, or would be admissible, under any will drawn pleas which they would be entitled to file in this cause.

A trial was had by the court and a jury; and the plaintiff introduced the lease which, among other covenants, contained these:

" To have and to hold the above described premises, with the appurtenances, unto the party of the second part, their executors, administrators and assigns, from the 1st day of April, in the year of our Lord one thousand eight hundred and sixty-one, for and during and until the 1st day of April, in the year eighteen hundred and sixty-six.

"And the party of the second part, in consideration of the leasing of the premises aforesaid, by the party of the first part to the party of the second part, does covenant and agree with the party of the first part, his heirs, executors, administrators and assigns, to pay the party of the first part, as rent for said demised premises, the sum of one thousand dollars per year, in quarterly installments.

"And the party of the second part further covenants with the party of the first part, that the second party has received said demised premises in good order and condition, and that at the expiration of the time in this lease mentioned they will yield up the premises to the party of the first part, in as good condition as when the same were entered upon by the

party of the second part, loss by fire or inevitable accident, or ordinary wear excepted.

"And it is further covenanted and agreed by and between said parties, that the party of the first part shall paint the outside of the house situated upon said premises, and known as the Brighton House; also to construct a suitable horse shed to occupy the position of the former one, and also to cause to be put down a side track upon said premises.

"It is further understood and agreed that in case the parties of the second part shall keep and retain the premises above mentioned for and during the term of five years from the 1st day of April, 1861, that then and in that case the rent of said premises so leased shall not commence until the 1st day of September, A. D. 1861. But in case the parties of the second part shall vacate the premises on or before the 1st day of April, A. D. 1862, that then and in that case the rent of said premises to commence on the 1st day of April, A. D. 1861, at the rate of $1000 per year."

Plaintiff also introduced as a witness *John King*, who testified: I live in Brighton; the defendants vacated the Brighton House in the fall of 1861; it was after the State Fair; the Brighton House was used for a hotel; there were quite a number of cattle yards attached; there had been a horse shed there prior to 1861; there was no horse shed built there in 1861, and is none now; it was burned down in 1861; there was no railroad track to the cattle yards.

Defendants then called as a witness *James Michie*, who testified, as follows: I live in town of Lyons, and know the parties and the Brighton House; it was constructed for a drovers' hotel, and had a large number of cattle yards attached; there was no side track constructed for the hotel and cattle yards in 1861; there was no horse shed there; defendants went into the house in the spring of 1861, and furnished it for, and kept it as a hotel; I heard a conversation between the plaintiff and William H. Lunn, in the fall of 1861, after the State Fair; Lunn and myself went into the

Tremont House to give the plaintiff the key to said Brighton House; Lunn told the plaintiff "he could not keep the premises, as there was no side track constructed there, nor any horse shed;" Mr. Gage replied, "there had been a side track;" Mr. Lunn remarked, "you have neglected to lay the track, and build the shed, although I notified you to do it; the track for the Fair was not on the Brighton House premises, but was off on the other side of the road; Mr. Gage said, "a track had been laid;" Lunn replied, "what benefit is that to the house?" the hotel is constructed apparently to make a bull's head of it, at the forks of the Archer road and the plankroad; the house is of little use without the cattle yards; the defendants left because there was no horse shed, and no side track, and told the plaintiff. so; a great many cattle passed over the Chicago, Alton and St. Louis Road; they could not be loaded, nor unloaded, without a side track at the yards; I have kept a hotel, and am acquainted with the business; a house like the Brighton House, without a horse shed and side track, would not be worth keeping; a great many cattle passed over that railroad in 1861; the hotel keepers get pay for yarding and keeping the cattle, and for boarding the men; the track to the Fair grounds was not so near to the Brighton House as the main track, and did not touch the premises; it was taken up again after the Fair; the Archer road and the plankroad lay between it and the Brighton House; Mr. Gage took the key when Lunn handed it to him.

The defendants then called *Daniel Christman*, who testified: in May, 1861, William H. Lunn asked Mr. Gage when he was going to build the side track and shed; the defendants furnished the Brighton House, put it in order and moved in in 1861; and put it in repair a few days before the Fair; they plastered and painted it inside; there was no horse shed built there in 1861; I lived 60 rods south of it.

*Edward Brainbridge, Jr.*, was called, who testified: I know the Brighton House, and am a cattle drover; the most convenient yards for the Alton and St. Louis Railroad, in 1861,

were at the Brighton House; am acquainted with the business of keeping a hotel at a bull's head; they charge 10 cents each for yarding, and $1.25 per week for keeping cattle, and $1.00 a day for boarding the men; a *side track must be constructed* from which an inclined plane must lead into the yards; people would not patronize a house off from the yards; the house and premises without a side track, and place to unload the cattle, by an inclined plane leading into the yards, *is worth nothing;* drovers will not go there, nor patronize a house without a side track; this house, in 1861, was not patronized by drovers at all, nor is it now.

*Simon Anderson* testified: I went to live at the Brighton House December 25th, 1861; I took care of the house for the rent; the cattle yards are 120 yards west of the house; there are nine; no horse shed was built there in 1861, nor side track to the yards or house.

*Patrick Brown* testified: In 1861, I was foreman of tracklayers on the St. Louis Railroad; I laid the side track to the State Fair grounds; it took from four to six days; to lay a side track to the Brighton House cattle yards would take *twenty* men about five days; the track I laid for the Fair in no way went to the Brighton House or cattle yards.

They then called *Mr. Marrs,* who testified: The land about the Brighton House is smooth, level prairie; the plaintiff did not build a shed or lay a side track there in 1861; the railroad runs within 40 rods of the house; the house used to do a good business, but not much since the railroad was built; the house is a very large one; there is a good deal of travel on the road; it is not patronized like Myrick's or Ulich's, where they have side tracks; the horse shed would be a great advantage to the house.

After all of the evidence was introduced, the court, at the request of plaintiff, gave to the jury the following instructions:

1. Under the lease, the defendants had the right to vacate the premises the next day after they entered into possession,

if they were dissatisfied therewith, or with the terms of the lease; and in such case, the plaintiff could only recover, at the rate of a thousand dollars a year, from the 1st day of April, 1861.

The written lease, introduced in evidence, fixes the rights of the parties. And if the jury believe, from the evidence, that the defendants vacated the premises, mentioned in the lease, on or about the 1st day of November, 1861, then the defendants are chargeable, under the lease, at the rate of a thousand dollars a year, from the 1st day of April, 1861, until they vacated the premises, together with interest, at the rate of six per cent., from the time the defendants vacated the premises; deducting therefrom the damages, if any, sustained by defendants for the failure of plaintiff to fulfil the covenants made by him, in said lease.

2. If the jury believe, from the evidence, that the defendants have not notified the plaintiff to make the improvements specified in the lease, prior to the time they vacated the premises, then under the evidence in this case, the jury may consider whether the defendants are entitled to any reduction of damages by way of recoupment or off-set.

At the request of defendants, the court gave these instructions:

1. And the jury are instructed, that on the question of damages, they must examine all the facts; and it is for them to say, from such facts, what damages the defendants have sustained.

2. If the jury believe, from the evidence, that plaintiff, on the premises leased to defendants, covenanted in his lease to erect a shed, paint the house, and build a side track, which he neglected to do, for an unreasonable time, and that for the want of said improvements, the defendants suffered damages, then the amount of damages is a proper off-set to be allowed on the rent due. *And if it equalled or overrun the amount of rent due on the lease, the jury will find for the defendants.*

The court also gave other instructions for the defendant, but as they announce the same rule, or relate to matters not affecting the questions arising in the case, they are omitted.

The jury returned a verdict in favor of the plaintiff for two hundred and seventy-five dollars.

Defendants entered a motion for a new trial, which was overruled by the court, and they excepted; and the court rendered a judgment on the verdict.

To reverse which, they prosecute this appeal; and, amongst other things, assign the following errors:

1. The court erred in overruling the motion for a new trial.

2. The court erred in deciding that the building of a side track and shed by plaintiff were not conditions precedent.

3. The verdict and judgment should have been for defendants.

Messrs. GARRISON & BLANCHARD for appellants.

Messrs. KALES & WILLIAMS for appellee.

Mr. CHIEF JUSTICE WALKER delivered the opinion of the court:

Had appellant a right to abandon the contract and remove from the premises after taking possession, under the lease? The grounds relied upon are, that appellee had failed to erect a horse shed, a side track, or paint the house, according to his covenant in the lease. It is insisted that, without these improvements and repairs, the property was useless as a hotel, and of little or no value; but with the improvements, the house could have done a good business. The abandonment of the premises is sought to be justified upon the ground, that the performance of these covenants were conditions precedent, and a failure by the lessor to make them, released the lessees from their covenants.

The covenants referred to are these:

"And it is further covenanted and agreed by and between said parties, that the said party of the first part shall paint the outside of the house situated upon said premises, and known as the Brighton House; also to construct a suitable horse shed to occupy the position of the former one, and also to cause to be put down a side track upon said premises."

There is no time specified when these acts shall be performed, nor does it appear from the lease that they were to precede other acts to be performed by either of the parties. It will not be doubted that the parties supposed that these improvements and repairs were necessary for the better enjoyment of the property for the purposes for which it had been designed. If necessary for the enjoyment of the property as a hotel, it must be intended that they were designed by the parties for the benefit of the lessee during the term. Nor can we, for this reason, suppose, that if it was only expected that it would be made at or near the end of the term, that these covenants would have been inserted in this lease. It was manifestly to enhance the value of the property as a hotel, during the term, that they were to be made, and if so, it would seem to follow, that it was designed they should be made at least in a reasonable time.

The true rule for construing covenants is stated in *Davis* v. *Wiley,* 3 Scam., 234. It is there said, that "covenants are to be construed to be dependent or independent, according to the intention of the parties, and the good sense of the case; and that technical words should give away to such intention." Testing these covenants by this rule, we must hold that they were mutual and dependent. And there being no stipulation that they were to be performed by appellee before appellants entered into possession under the lease, and as they were necessary to the more profitable enjoyment of the lease, and it was no doubt so understood by the parties, they should have been performed in a reasonable time, and if they were not, appellee had no right to recover. *Copps* v.

*Smith*, 3 Scam., 177; *Baird* v. *Evans*, 20 Ill., 29.    Again, in the case *Mecum* v. *The Peoria and Oquawka Railroad Co.*, 21 Ill., 553, it was held that "courts will not, and ought not to construe covenants and agreements, as independent, and still enforce a performance by the other party, unless there is no other mode of construing the instrument, and unless it clearly appears to have been the deliberate intention of the parties at the time the instrument was executed." In this case, there is nothing to show, or from which it can be inferred, that appellants should occupy the premises, at the stipulated rent, in the condition they were when leased, and that appellee should have the entire term within which to make the improvements.

It would be a more rational and natural construction to say that it was designed that they should be made before appellants entered. But they having gone in without insisting upon them as precedent, we must suppose that they were understood to be mutual, and to be performed in a reasonable time. To hold that appellee had the entire term to make the improvements and repairs would be so manifestly unjust, that we cannot imagine that the parties would deliberately enter into such an agreement. But if such was their purpose, they have failed to express it in the lease. Had appellee made the improvements before appellant abandoned the property, it would have been in time, as that would have been the construction put upon the covenants by the parties themselves.

We said, in *Wright* v. *Lattin*, (decided at the present term,) that it may be, if the landlord covenants to repair before the term commences, and fails to do so, the tenant might refuse to enter upon the premises. But having entered under the lease, and received possession, he cannot abandon the lease, and refuse to pay rent, because of the breach of that or any other covenant, except for quiet enjoyment. If the landlord fails to repair, according to

his covenant, the tenant may recoup the amount of dam ages, thus sustained, from the rent, or he may sue upon the covenant.

It then follows, that as appellants entered upon the term, and enjoyed the premises from some time in the month of April, until in November, 1861, they became liable to pay rent for the time they thus occupied the premises.   But they were also entitled to recoup all damages which they sustained by reason of the repairs not having been made by appellee.    By appellee's second instruction, the jury were informed that such were their liability and their rights under the lease, and the jury seem to have acted under this instruction.    Appellants seem to have been in possession for between six and seven months, yet the jury only found them liable to pay $275, less than half of the rent stipulated to be paid, by the terms of the lease.    The jury could not have arrived at this conclusion had they not deducted the damages sustained by reason of the repairs not having been made, as they were authorised to do, under the instruction.    We think the instructions fairly presented the law of the case to the jury, and that the evidence warranted their finding. We perceive no error in this record, and the judgment of the court below must, therefore, be affirmed.

*Judgment affirmed.*