# WILLIAM H. LEAVERS

*v.*

## ANN CLEARY *et al.*

| 75 | 349 |
| 135 | 380 |
| 34a | 515 |
| 75 | 349 |
| 54a | 575 |
| 57a | 667 |
| 75 | 349 |
| 63a | 96 |
| 65a | 287 |
| 75 | 349 |
| 88a | 84 |
| 75 | 349 |
| 92a | ²248 |
| 75 | 349 |
| 193 | ²135 |

1. CONTRACT — *in regard to mining, construed.* The owners of coal lands entered into a contract with a coal company, by which they sold all the coal, coal oil and other minerals contained in the lands, to the company, and were to convey to the company ten acres of the land for about half its value, and in which the company agreed to sink a shaft to the depth of 230 feet, for the purpose of mining the coal, the owners agreeing that, if a good vein of coal was not found within that depth, of sufficient thickness, and of such quality as to justify mining the same, the land should be reconveyed to them, the price thereof refunded, and the owners should pay the entire expense of sinking the shaft ; but, if the coal was found, the company was to pay the owners ten cents for each ton raised. After operating the mine under the contract for some time, the company sold out to another, who bought lands near the shaft and proceeded to cut through to reach his own lands, intending, after that, to quit mining on those where the shaft was sunk : *Held,* on bill filed by the owners to restrain such purchaser from running entries from the shaft to his own lands, and to protect their rights, that the intention of the parties was, that the mining should be confined to the lands embraced in the contract, and that the purchaser, having notice of the contract, could not be allowed to abandon the complainant's land, and use the property conveyed and the shaft for the sole purpose of mining other lands, from which complainants would derive no profits.

2. SAME — *in construing, courts will look at the construction given by the parties.* The construction given to a written contract by the parties themselves, as shown by their acts under it, may be resorted to as a means of determining the true intention they had in view in entering into the same.

WRIT OF ERROR to the Circuit Court of Livingston county; the Hon. CHARLES H. WOOD, Judge, presiding.

Mr. A. E. HARDING, and Mr. L. E. PAYSON, for the plaintiff in error.

Messrs. STREVELL & GARATT, for the defendants in error.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

This was a bill in equity, brought by Ann Cleary and William Cleary, her husband, in the Circuit Court of Livingston county, against William H. Leavers, to enjoin him from mining coal from certain lands not embraced in a certain contract entered into between his grantor and William Cleary.

It appears from the record that, on the 30th day of May, 1865, Ann and William Cleary, being the owners of certain coal lands in Livingston county, entered into a contract, in writing, with the Pontiac Coal Company, by which they sold all the coal, coal oil and other minerals contained in the lands, to the company. The contract contains a provision that about ten acres of the land should be conveyed to the company for the sum of $1,984, which was about one-half the real value of the land. The coal was, however, reserved.

The company agreed to sink a shaft, for the purpose of mining the coal contained in the land, to the depth of 230 feet; the Clearys, however, guaranteed that a vein of coal would be found under the land not exceeding the distance, specified in the contract, which the shaft was required to be sunk, of sufficient thickness and of such quality as to justify the mining of the same.

In the event that coal was not found as provided in the contract, then the land was to be reconveyed, the money refunded, and in addition, the Clearys were to pay the company the entire expense of sinking the shaft.

The company agreed, in the event coal was found as specified, to pay the Clearys ten cents per ton for all coal taken from the mine.

The deed mentioned in the contract was executed and delivered; the company sunk the shaft, and at the depth of 175 feet found a vein of coal four feet six inches thick, of good quality.

The company proceeded to mine the coal under the contract, and continued operations, accounting to complainants

for all coal mined, at the price agreed upon, until the year 1872, when the defendant acquired the title of the company in the contract, and lands conveyed, and took possession of the mine.

He mined from the lands a large quantity of coal, and raised it from the shaft, but refused to pay the stipulated price to the complainants.

It further appears that a short time before the filing of the bill the defendant acquired other coal lands adjoining those embraced in the contract, employed a large force of hands, and commenced cutting through the vein of coal between the lands so acquired and the lands named in the contract, a distance of 30 or 40 yards, with the intent and purpose, as soon as he reached the coal on the leased land, to abandon the coal mine named in the contract, and work exclusively on the mine in the leased land, but raise all coal mined through the shaft sunk in the land embraced in the contract.

The object the defendant had in view was to avoid the payment to complainants of the ten cents per ton which they were entitled to receive under the contract.

The only question presented by the record arises on the construction to be placed upon the contract entered into between complainants and the coal company.

In placing a construction upon the contract, the intent and understanding of the parties, at the time it was executed, is an important element to be determined and considered.

The defendant acquired the interest the coal company had in the lands, with full notice of the contract between complainants and the company ; he is, therefore, standing in the shoes of the coal company ; his rights, duties and obligations are to be measured by those of the coal company, and are to be governed by the contract entered into by complainants and the company.

When, therefore, the defendant commenced working the mine, he was bound to run it in the same manner, and account to the complainants for all coal raised, at the same rate that was required of his grantor. It will be observed that in entering

into the contract the complainants parted with valuable property, and incurred a heavy liability.

They parted with all the coal and minerals in the lands, conveyed ten acres absolutely for one-half its value, gave a guaranty that coal would be found, under a penalty to pay the entire expense of sinking the shaft, if coal in quality and quantity to justify working was not found.

What consideration were complainants to receive for the liability incurred, and the property they transferred?

The consideration was, the agreement of the coal company to work a shaft on the lands, mine the coal, and pay ten cents per ton for all coal raised from the mine.

It was obviously the intent of the parties that the mining should be confined to the lands embraced in the contract; no allusion is made to mining elsewhere; at the time the contract was made, it does not appear that the company had, or ever expected to have, any interest in lands adjoining those embraced in the contract.

It is unreasonable to suppose that the complainants would have consented to part with valuable property at half its value, and assumed the responsibility of refunding the entire expense of sinking the shaft, if the coal company had the right, the moment coal was found, to cut an entry from the shaft to adjoining lands, abandon the coal for which complainants were to receive ten cents per ton, and use the property conveyed and the shaft for the sole purpose of mining coal from other lands, from which complainants would receive no profit.

Such a construction of the contract would be unreasonable, and would require complainants to sacrifice their property, and receive nothing in return.

By reference to the contract, a clause will be found, in the language following : "And it is further agreed between the parties to this contract, that the said party of the second part is to work a shaft for the purpose of mining coal."

The shaft was required to be sunk on the land embraced

in the contract. Where did the parties to the contract intend that the mining should be done? No lands are spoken of, or in any manner alluded to, except those embraced in the contract; those lands, and no other, were the subject matter of the contract, and the conclusion is irresistible, that the parties intended that the mining should be confined to the lands embraced in the contract.

The construction the parties to the contract placed upon it themselves for seven years, by mining the lands named in the contract, and paying the stipulated amount per ton, during which time it is neither claimed nor insisted upon that the right exists to cut across the line, where coal might be obtained at a lower rate, may be resorted to as a means of determining the true intention of the contracting parties at the time the contract was executed. *Lunn* v. *Gage*, 37 Ill. 19.

While it is true, it is no part of the duty of courts to make contracts for parties, yet, in placing a construction upon a contract, it is proper to scrutinize the language used, and determine the intention, and then place that construction upon the contract which will carry into effect and enforce that intention.

We are fully satisfied that it was not within the design or contemplation of either party to the contract involved in this case, that the land and shaft embraced in the contract should be used for the purpose of mining coal from other or different lands than those mentioned in the contract; and when the defendant undertook to run an entry from the shaft to other lands, for the purpose of mining in such lands, and raising the coal through the shaft, he was violating the spirit of the contract, and seeking an undue advantage of complainants, which it was proper for a court of equity to restrain him from doing.

The decree of the circuit court will therefore be affirmed.

*Decree affirmed.*