## Margaret Pruett et al., Appellees, v. O'Gara Coal Company, Appellant.

1. CONTRACTS—*how cannot be varied.* An oral understanding between the parties to a contract, even if fully proven will not be permitted to vary the terms of the written contract entered into by them, especially as against the assignee of one of the parties.

2. CONTRACTS—*when separate instruments construed together.* Where two separate contracts bear the same date and were intended to be considered as one contract, they will in law be so construed.

3. CONTRACTS—*what not synonymous with "coal shaft".* Held, that the term "coal shaft" as used in the mining contract in question in this case, was not synonymous with the term "coal mine".

4. CONTRACTS—*mining construed.* Held, that the certain negative covenants under consideration in this case, did not either expressly or by implication inhibit the party from mining coal on certain premises and hoisting it through a shaft sunk on other premises.

Bill in chancery. Appeal from the Circuit Court of Saline county; the Hon. A. W. LEWIS, Judge, presiding. Heard in this court at the March term, 1911. Reversed and remanded. Opinion filed November 11, 1911.

WILLIAM S. HEFFERAN and M. S. WHITLEY, for appellant.

CHOISSER, CHOISSER & KANE and W. F. SCOTT, for appellees.

MR. JUSTICE HIGBEE delivered the opinion of the court.

Appellant prosecutes this appeal from a decree, granting a permanent injunction in compliance with the prayer of a bill in chancery filed against it, by appellees, to the June term, 1910, of the Circuit Court of Saline county.

It is alleged in the bill, that on June 13, 1903, the Egyptian Coal & Coke Company entered into a written agreement under seal with John and Margaret Pruett, for the purpose of securing the right to sink a shaft

and open a coal mine on certain lands of said John
Pruett in said Saline county. Said agreement which
is set out in full in the bill, provides among other.
things, that said John and Margaret Pruett, in con-
sideration of one dollar paid to them and the further
consideration of three cents per ton for all mine run
coal, which said Egyptian Coal & Coke Company should
mine and hoist from certain premises therein described,
grant, bargain, sell and convey to said company all the
coal which might be found under and upon said prem-
ises, comprising about 296 acres of land in said Saline
county; also the right to use and occupy about three
acres adjoining said lands for the purpose of manu-
facturing coke from coal taken from said premises and
for locating rail or other roads, for marketing said
coal and coke and also for ponds, shafts, tipples and
necessary buildings around the same; also two other
strips of land fifty feet wide for railroad right of way;
that said company should within five months and
fifteen days from January 24, 1903, commence to sink
a shaft for the purpose of mining coal on said prem-
ises and push the same to completion as speedily as
practical; and continue the development of said mine
to such an extent that after two years the annual out-
put of coal should be not less than 40,000 tons a year,
for a period of fifty years, or until all the coal that
could be practically mined under said lands, should
have been removed; that said company should pay to
said Pruetts not less than $1,200 per annum as royalty
for the coal taken from under said lands during the
continuation of the lease, unless prevented from oper-
ating the mine by high water, fire, wind storms or
strikes; that the cost of said shaft with tipples, etc.
should be not less than $15,000; that no coal should be
hoisted from lands other than those above mentioned
from the shaft or shafts sunk on said lands, without
the written consent of said John Pruett and Margaret
Pruett or their heirs or assigns, during the continua-

tion of the lease; that said party of the first part should have the right to enter said mines "himself" or by representative, for the purpose of inspecting the same and should also have the right to examine the books of said company, for the purpose of ascertaining the amount of coal raised from the mines each day; that said company should have the right to renew the lease on the same terms, if all the coal was not mined and removed therefrom within said term of fifty years; that the company should have the right to terminate the lease upon three months' notice in writing, to said Pruetts, their heirs or assigns, of its intention so to do, and at the termination of said lease, should have the right to remove all machinery therefrom, leaving the shaft, track, tipple and permanent buildings.

The bill further alleged that in pursuance of said contract, said company began sinking a shaft and opening a mine on said premises, which was known as Egyptian No. 1 and at the same time commenced to sink another shaft about half a mile southwest of said mine upon lands contiguous thereto and leased from other parties, known as Egyptian No. 2; that while said mines were being developed said parties entered into another contract. This contract which is also dated June 13, 1903, and is likewise set out in full in the bill, includes a leasing by said Pruetts of some five acres of ground adjoining that named in their former contract, in consideration of which, said company agreed to pay the sum of $300 in cash, certain taxes, and to sink on said five acre tract or other land leased for the surface as soon as practical, an escapement shaft. It was further stated in said second contract that said company covenanted with said Pruetts, in consideration of said leasing, that its coal shaft known as No. 1, situated on lands leased from the parties of the first part by the said party of the second part, should never be connected underground with any other coal mine either by it or by its assigns, without the written consent of said Pruetts or their heirs or as-

signs; also that the company should have the right to use the premises therein described for the purpose of manufacturing coke from coal taken from the premises named in the former lease between the parties and for roads, buildings, shafts or tipples as might be deemed necessary; that in case of the termination of the lease, the company should have the right to remove any machinery it might own, from said premises, which would leave all tipples, shafts and buildings intact and that in case the first lease of the other premises should become void, then the second lease should also immediately become void.

The bill further stated that at the time of the execution of the first lease, said Pruetts were anxious to have, and required said lease to be so drawn that coal from lands other than their own could not and should not be hoisted through any shaft or shafts sunk on their lands or mixed and commingled with coal mined from their lands and to that end caused the negative covenant in regard to that subject above referred to, to be inserted therein; that at the time of the execution of the second lease in order to further guard against mixing and commingling their coal with coal from other lands and to prevent the hoisting of coal mined from their lands through any shafts other than those sunk on their own lands, they caused the negative covenant above referred to upon that subject, to be inserted in the second lease; that on August 21, 1905, it sold its mine known as Egyptian No. 1 and Egyptian No. 2 to appellant, the O'Gara Coal Company, and at the same time transferred and assigned both said leases to said appellant and put it in possession of said premises; that during the time the Egyptian Coal & Coke Company operated said mine on the Pruett land, it never hoisted coal of other mines through the Pruett shaft, nor hoisted coal from the Pruett land through other shafts or commingled them together; that after appellant took possession of said mines they were renamed and the mine known as Egyptian No. 1 became and is now O'Gara

No. 2 and Egyptian No. 2 became and is now O'Gara No. 3; that appellant has driven an entry in O'Gara No. 3 parallel with the south line of the Pruett land and about 180 feet distant therefrom, and from said entry has driven three pairs of entries in a northerly direction at a distance of about 500 feet apart into the Pruett land, thereby connecting the mine formerly known as Egyptian No. 1 with the mine formerly known as Egyptian No. 2 and that such entries were driven without the consent of the Pruetts; that appellant has already taken out a small portion of coal from the Pruett land through the shaft at what is now known as O'Gara No. 3 in violation of the spirit and letter of the negative covenants of said leases; that appellant is now threatening to mine and hoist coal from the Pruett lands through its shaft at O'Gara No. 3 in violation of the negative covenants of said leases and will do so unless restrained by an order of the court; that appellant has abandoned the use of the mining shaft at O'Gara No. 2, so far as mining and hoisting coal is concerned, and is permitting the mine to fill up with water and the entries and passageways to fill with slate, rock and other substances; that the whole mining plant, including permanent buildings, tipple, shaft, entries, rooms and other portions, is fast becoming out of repair and is in a ruinous condition; that if appellant should exercise its election under said lease to terminate the same by giving three months' notice of its intention so to do, complainants will be deprived of valuable rights and interests. secured to them by said leases, and will suffer great permanent and irreparable injury; that the said John Pruett died intestate March 3, 1909, leaving surviving him Margaret Pruett his widow, and Albert G., Francis M., and John M. Pruett, his children and only heirs at law.

The prayer of the bill was that appellant be perpetually restrained and enjoined from hoisting the coal to be mined from the Pruett lands described in said leases, through its shaft at O'Gara mine No. 3

or through any other shaft except that at O'Gara mine No. 2 or other shafts to be located on the lands described in said leases.

Appellant in its answer, admits the execution of the two contracts set out in appellees' bill, that it has temporarily ceased operating O'Gara No. 2, but states it has not wrecked and abandoned the same; admits driving the entries from O'Gara No. 3 to appellees' land and that it has taken out a small amount of coal from under the latter and that it intends to mine the coal under appellees' land and hoist it through the shaft at O'Gara No. 3, but denies that appellees will be injured thereby or that such act will violate any of the provisions of said leases, and saves to itself all manner of exceptions and demurrer to the bill.

Upon the hearing the court below found the issues for appellees and entered a decree for an injunction, as prayed for in their bill of complaint.

The evidence in the case tended to prove the principal allegations of complainants' bill to an extent which would have warranted a decree in favor of complainants in case the construction, which they place upon the two contracts in evidence, is the correct one. It is true that evidence was admitted on the trial tending to show the reason why John Pruett caused certain clauses to be inserted in the two contracts and what was said concerning the matter by the parties thereto, at the time the contracts were entered into. We do not think, however, that any oral understanding between the parties, even if fully proven, could be permitted to vary the terms of the written contract entered into by them, especially as against the assignee of one of the parties.

The provisions of the contract which are involved in the controversy, consist of two negative covenants, and at the risk of partial repetition, we will set them out here in full. They are, first, that provision of the first contract which states, "It is further stipulated and agreed that no coal shall be hoisted from lands other

than those above mentioned from the shaft or shafts, sunk on said lands, without the written consent of said John Pruett, and Margaret Pruett, or their heirs or assigns, during the continuation of this lease;'' and second, the following provision of the second lease: ''And the said party of the second part further covenants with the said parties of the first part, that in consideration of said leasing, that its coal shaft known as No. 1, situated on lands leased from the said parties of the first part by the said party of the second part, shall never be connected underground with any other coal mine either by it or by its assigns, without the written consent of the said parties of the first part, or their heirs or assigns.''

It was undisputed that no coal had been hoisted through the shaft on the Pruett lands, which had been mined under any other lands than those mentioned in the Pruett lease, nor does it appear that appellant contemplated hoisting coal from other than the Pruett lands, through said shaft, and the only reason for considering the provision in reference thereto, contained in the first contract, is for the light it may throw upon the construction to be given the provision of the second contract.

It was not contested that appellant had driven three entries under the Pruett land from their workings in the mines located under adjoining lands; that it had taken out some coal from under the Pruett lands through the shaft sunk on adjoining lands, and that it contemplated removing more coal from the Pruett lands through the same shaft.

The reason assigned by appellant for so doing was that under present advanced mining methods, it could remove the coal from the surrounding territory with greater advantage to itself through the shaft they had been using and proposed to use, than by using the Pruett shaft for the coal mined from the Pruett lands and the other shaft for coal mined from the other lands. We think this claim is unimportant as regards

the solution of the problem presented here, except per-haps as showing good faith on the part of appellant in the manner of prosecuting its mining operations.

The contention of appellee is that the negative cov-enants contained in the two provisions of the contract in question, either expressly or impliedly preclude ap-pellant from mining coal under the Pruett lands, re-moving it therefrom through entries connecting the lands named in the Pruett lease with other lands, and hoisting it through a shaft sunk upon such other lands.

Appellees rely largely to sustain their position, upon the case of Leavers v. Cleary, 75 Ill. 349, where a bill in equity was brought by Cleary to enjoin Leavers from mining coal on certain lands not embraced in a contract entered into between Leavers' grantor and Cleary. That contract contained a provision that the grantee of the coal should "work a shaft for the pur-pose of mining coal." Under the contract the com-pany, which was Leavers' grantor, sunk a shaft and proceeded to mine the coal and afterwards sold their interests to Leavers. Subsequently Leavers acquired other coal lands adjoining those embraced in said con-tract and commenced cutting through the vein of coal between the lands so acquired and the lands named in the contract, with the intent and purpose of abandon-ing the original mine and working exclusively on the mine in the leased land, and of raising all coal mined through the shaft sunk on the land embraced in the contract.

An injunction was granted against Leavers to pre-vent him from carrying out the purpose indicated. A number of reasons which do not concern us here, are stated in the opinion of the Supreme Court, why the injunction should be sustained, and it is also said by the court that when Leavers undertook to run an entry from the shaft on the lands in the original contract to the other lands acquired by him, outside of the same, for the purpose of mining such lands and raising the coal through said shaft, he was violating the spirit of

the contract and seeking an undue advantage of Cleary, which it was proper for a court of equity to restrain him from doing.

In the case of Consolidated Coal Co. v. Schmisseur, 135 Ill. 371, the principal question presented, was whether a case was made by appellee that would give a court of equity jurisdiction to interfere by injunction, to prevent appellant from using the entries, shaft and leased ground upon her land, to transport and hoist coal taken from the adjoining lands, owned by appellant. The lease stated that it was "granted for the purpose of enabling said Schuremans to sink pits or shafts and successfully mine and remove the coal conveyed to them by appellee." In the course of the opinion it is said: "We have been referred to no case holding that a court of equity would exercise its jurisdiction to prevent a breach of a negative covenant unless it was express, or could fairly be implied from the stipulation of the parties, and injury would result to the complainant by its breach. In the one case, as we have seen, equity jurisdiction proceeds upon the ground of the express stipulation of the parties alone, irrespective of whether substantial injury will be incurred or not. In the other, the parties not having fixed in their agreement, by express covenant, what shall not be done, equity proceeds only to prevent irreparable injury."

The opinion also discusses the case of Leavers v. Cleary, *supra,* and declares it is not inconsistent with the views above expressed. The Leavers case cannot in any event be of value as a guide in assisting us to determine this case, for the reason that a different question, in fact almost the converse of the one presented here, was there under consideration. In that case one of the principal questions involved, was the claim of the right to abandon the mining of coal on the leased property, and to mine coal upon adjoining property convey it to the shaft on the leased property and there hoist it. Had the same question been presented here

there is no doubt but what an injunction would lie, as such action would be a direct breach of the negative covenants of the leases; but on the contrary the question presented here is the right, not to abandon mining coal on the leased premises but to continue such mining and convey the coal from the leased premises to be hoisted from a shaft on other premises. These conditions the Leavers case does not deal with, nor elucidate.

The two contracts in this case, while made at different times, bear the same date and were no doubt intended to be considered as one contract and they should in law be so construed. It was evidently the intention of the Pruetts, and agreed to by the other party when the first contract was entered into, that no coal should be hoisted from lands other than those included in the contract from the shaft or shafts sunk on the lands in the contract, without the consent of the Pruetts, their heirs or assigns. When the second contract was entered into, a provision was inserted that the coal shaft situated on the lands leased from the Pruetts should never be connected underground with any other coal mine by said coal and coke company or its assigns, without the written consent of the Pruetts or their heirs or assigns. It appears to us that the purpose of these two sections was the same,—that is, to prevent the mining of coal upon other than the leased lands and hoisting the same through the shaft in question. The provision in the second lease would appear to have been inserted to make it impossible for the coal company to commit a breach of the first provision, by providing that there should be no connection between the shaft and any coal mined outside of the leased premises, and therefore there could be no outside coal to hoist through said shaft.

The charge of the bill is, and it is supported by the proofs, that appellant has abandoned the use of the shaft on the Pruett premises and intends in the future, as it has to some extent in the past, to continue to mine the coal on said premises but to remove it through

other premises and hoist it from the shaft on such other premises outside of the Pruetts' lands.

It appears therefore that the mine on the Pruett premises is not to be abandoned but to be continued in operation and that the shaft itself on the Pruett premises is not to be connected with outside mines but that it has been and is to be abandoned. The terms of the contracts have not therefore been broken and will not be so far as the charges in the bill and the evidence in the case are concerned, unless the term "coal shaft" as used in the contract, must be held to be synonymous with the term "coal mine."

The Century Dictionary defines a mine as "an excavation in the earth made for the purpose of getting metals, ores or coal" and defines a shaft to be "in mining, a vertical or inclined excavation, made in opening the ground for mining purposes." Under our Mining Act (Rev. Stat., chap. 93, sec. 34), the words "mine" and "coal mine" are said to "signify any and all parts of the property of a mining plant on the surface or underground which contribute directly or indirectly under one management, to the mining or handling of coal." And the term "shaft" is said to mean "any vertical opening through the strata which is or may be used for purposes of ventilation or escapement, or for the hoisting or lowering of men and material in connection with the mining of coal."

It is plain therefore, that the term "shaft" is much more restricted in its signification than the term "mine" and that the two are not synonymous. It might be that the term "coal shaft" could be used in an instrument in such manner as to evidently intend to be understood as meaning "coal mine," notwithstanding the actual difference in the definition and common understanding of the two terms, but there is nothing in the instruments in question which would indicate that the two were intended to be used as synonymous terms.

We are therefore of opinion that the two negative

covenants of the contract under consideration, do not either expressly or impliedly inhibit appellant from mining coal on the Pruett premises and hoisting it from the shaft sunk on other premises.

Some other reasons of minor moment are advanced by appellees why the injunction should be sustained but they do not appear to us to suggest conditions which require the action of a court of equity.

The decree will be reversed and the cause remanded with directions to the court below to dismiss the bill for want of equity.

*Reversed and remanded with directions.*