SAMUEL P. WALKER *et al.*

*v.*

ROBERT M. DOUGLAS *et al.*

1. CONTRACT—*rule of construction.* Contracts should be so construed as to give effect to the intention of the parties, and where that intention is sufficiently apparent, effect should be given to it, even though violence be thereby done to its words; for greater regard is to be had to the clear intent of the parties, than to any particular words they may have used in the expression of their intent.

2. CONTRACT CONSTRUED—*whether executed or executory.* A contract, under seal, recited that the party of the first part "has this day sold" to the party of the second part certain property, etc., which was to be paid for in instalments, extending through a period of eighteen months. It also contained a clause by which the party of the first part bound himself, in a penal sum equal to double the amount of the purchase money, to convey the property upon payment of all of the instalments; and a further clause, that the party of the second part might, at the expiration of two years, elect whether he would affirm the contract, and if he should determine to rescind it, the party of the first part should take back the property, and refund whatever had been paid, with interest from the time of payment: *Held,* that it was not the intention or understanding of the parties that the contract was in anywise executed, but that it was purely executory, and that no present estate, either legal or equitable, was intended to be thereby vested in the party of the second part.

3. EVIDENCE. *Parol evidence* of the contents of the private books of a third party, without any basis being laid therefor, is incompetent.

4. PAYMENT—*presumption.* When a promissory note past due is in the possession of the maker, the law will infer, from this fact alone, unexplained, that it has been paid.

5. SPECIFIC PERFORMANCE. To entitle a party to a specific performance, he must show that he has been in no default, and that he has taken all proper steps towards the performance on his part.

6. SAME—*laches of the party asking for.* Mere lapse of time, when time is not expressly made material by the agreement of the parties, is not necessarily an objection to decreeing specific performance; but where there is great delay, unexplained, it is such evidence of *laches* as will preclude the granting of relief.

7. By the terms of a contract to sell and convey land, the last payment was due in January, 1858, and no offer was made to pay it until in January, 1873, and the only excuses offered for the delay were, the great intimacy and friendship between the parties, the civil war, the purchaser being a citizen of Memphis, Tennessee, the death of the purchaser in 1863, and the minority of his heirs: *Held,* that no reasonable excuse is shown why the payments were not made between the time they were due and the breaking out of the civil war, in 1861, or after the 6th of June, 1862, when communication was opened with the North, and that to allow complainants, under the circumstances, to have a decree for specific performance, would be contrary to the well established principles of equity.

8. MINORS—*disability of, no excuse for not asserting their rights under executory contract with their ancestor.* An infant heir can not avail himself of his disability to excuse the non-assertion of his rights under an executory contract made with his ancestor, when the immediate performance of his part of the contract is essential to the interest of the other party.

9. CONTINUANCE—*diligence.* An affidavit for a continuance which states that the party making it understood from the attorney of the opposite party that he would, on the trial, make certain proof, and, for that reason, affiant did not take depositions and make such proof himself, expecting that it would have to be made by the opposite party, does not show sufficient diligence to entitle the party making it to a continuance.

APPEAL from the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

Messrs. MOORE & CAULFIELD, for the appellants.

Mr. J. S. MURRAY, for the appellees.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

On the 23d day of July, 1856, Stephen A. Douglas, and J. Knox Walker, of Memphis, Tennessee, entered into a written agreement, under seal, whereby Douglas sold and agreed to convey to Walker lot number 7, in the west half of the north-west quarter of section 19, being ten acres of land in the north-east corner of said quarter section, and bounded by streets, laid out by the drainage commission on the map for drainage purposes, in the city of Chicago, upon Walker paying him $8000, according to the tenor and effect of his four promissory notes of that date—one for $2000, payable in ninety days, without interest; one for $2000, payable in six months, with ten per cent interest; one for $2000, payable in twelve months, with ten per cent interest, and one for $2000, payable in eighteen months, with ten per cent interest. It was also stipulated that, at the expiration of two years from the date of the agreement, Walker might elect whether he would affirm the contract, and in the event he should determine to rescind the same, Douglas was to take back the property and refund the purchase money, with ten per cent interest, from the date of each payment as the same should have been made. The notes were executed and delivered at the time the agreement was made, and the first two were paid at or near the time they became due. Whether the last two notes were ever paid, is one of the questions in controversy, and will be noticed in its order.

By a memorandum indorsed on the written agreement, in the hand-writing of J. Knox Walker, it appears that, on the 23d day of December, 1856, he assigned an undivided half interest in the purchase to his brother, Samuel P. Walker, who was to make one-half the payments.

A preliminary question relates to the construction of the contract. It is contended by complainants that the word, "sold," being used instead of the words, "agreed to sell,"

448    WALKER *et al. v.* DOUGLAS *et al.*    [Sept. T.

Opinion of the Court.

manifests an intention to vest a present equitable title; that the word, "sold," is made by our statute a word not only of conveyance, but of warranty also, and that Douglas could not, therefore, forfeit the contract, but his only remedy was to enforce a vendor's lien.

A familiar elementary principle of construction applicable here is, that it is the duty of the court "to discover and give effect to the intention of the parties, so that performance of the contract may be enforced according to the sense in which they mutually understood it at the time it was made; and where the intention of the parties to the contract is sufficiently apparent, effect must be given to it in that sense, though violence be done thereby to its words; for greater regard is to be had to the clear intent of the parties, than to any particular words which they may have used in the expression of their intent." 1 Chitty on Conts. (4 Am. Ed.) 104–5.

In *Broadwell* v. *Broadwell*, 1 Gilm. 600, it was said: "In applications for specific performance of agreements, it is immaterial what the form of the instrument is—whether it is a covenant, or a penal bond with a condition to do the thing. The great and leading inquiry is, what did the parties expect would be done?" See, also, *Fitzpatrick* v. *Beatty*, ib. 468.

We think there is no difficulty here in ascertaining, from the language used, that the parties did not intend or understand that the contract was in anywise executed, but that it was purely executory, and that no present estate in the property, either legal or equitable, was intended to be vested in Walker.

Douglas bound himself to Walker, in the penal sum of $16,000, for the performance of the conditions of the agreement. One of those conditions is in these words: "Now, it is expressly agreed, *that, upon payment* of each of said notes according to their tenor respectively, *the said Douglas is to*

*convey* to said Walker a good and sufficient title to said premises, with covenants of warranty in respect to title, defending the same against the whole world." What language could have been employed that would have more clearly expressed the idea that title was to be conveyed upon the performance of a future condition? That this form of expression clearly negatives all presumptions that any title was then vested, would seem to admit of no argument. Moreover, by another condition, Walker is allowed two years from the date of the agreement in which to determine whether he will elect to affirm or rescind the purchase of the property; and should he elect to rescind, the payments made are to be treated as in the nature of loans of money, which Douglas is bound to repay, with ten per cent interest. Manifestly, Walker was not bound to take this property until he exercised his right of electing whether he would have it or not; and it would be absurd to say that Douglas was bound, when Walker was not. In the absence of evidence showing that Walker had waived this right of election, there was not, therefore, an *absolute agreement* even to sell and *convey the property in the future,* much less in the present.

The circumstance that the promissory notes given by Walker to Douglas show the consideration for which they were given, we regard as possessing no controlling significance, since the sole motive which prompted it may have been to carry notice to subsequent holders, in the event of assignment, and this is quite as reasonable as any other presumption.

This, then, brings us to the question, were the last two promissory notes paid and taken up by J. Knox Walker? It is averred, in the original and supplemental bills, that they were, but denied in the several answers.

The burden is upon the complainants to make clear and satisfactory proof of all the material allegations in their original and supplemental bills, and this is one of them. If the evidence is such as to leave the question in doubt, there can

29—70TH ILL.

be no relief. *Trailor* v. *Hill*, 2 Gilm. 364; *Hartwell* v. *Black*, 48 Ill. 301.

It is not with much apparent earnestness insisted that there is sufficient evidence of the payment of the fourth and last note. The only evidence introduced, having a tendency that way, was, the declarations of Samuel P. Walker, which were received subject to objection, that he had furnished J. Knox Walker the money with which to make this payment. This was mere hearsay, not a part of the *res gestæ,* and was, therefore, incompetent, and can not be considered; nor, if true, would it overcome the presumption arising from the unexplained possession of the note by the representatives of Douglas. Although J. Knox Walker may have received the money to pay the note, it does not follow that he so applied it. If he paid it, the note should have been taken up, or evidence should have been produced explaining why this was not done.

The note was found, since the commencement of this suit, by the representatives of Douglas, in the possession of Riggs & Co., his bankers at Washington, where it had been pledged by him, on the 5th day of June, 1860, as a collateral security for the payment of a check, which he indorsed for one George W. Brega, for $250, and where it had since remained. It was protested for non-payment at maturity, and there is not a circumstance proved from which a remote inference even of its payment can be drawn.

The other note is not produced, and neither complainants nor defendants can give any account of it. There is no evidence of its payment, either circumstantial or direct. A statement was heard by the court, subject to objection, that the witness noticed an entry on the books of Riggs & Co. to the effect that it had been paid, but this was incompetent. In no case, so far as we are advised, was it ever held that parol evidence of the contents of the private books of a third party can be received in evidence, without any basis being laid therefor. The evidence is not entirely satisfactory that the note is not in existence. It appears that Douglas had a

residence at Washington, which he occupied during the sessions of Congress, and one at Chicago, which he occupied at other times.  Since his death, his widow has remained at Washington.  His executor, Rhodes, seems to have limited his administration of the estate to the property in Chicago, and does not appear to have taken charge of any personal property.  He is unable to find the note among the papers in his possession, and it is not in the possession of Riggs & Co. Whether it is among the papers left by Douglas at his residence in Washington, it does not appear.  As against the rights of his widow, who has charge of these papers, we may assume that the note is not there.  As against the other defendants, there is no competent evidence on the subject.  It is not shown where Douglas was in the habit of keeping such papers, and it does not, consequently, appear that proper, but unavailing, search has been made; but if the fact were fully proved that, after all proper search, the note could not be found, it would not follow, as a conclusive presumption, that it had been paid.  It may have been assigned to a third party, or it may have been lost or accidentally destroyed.  True, the inability of the defendants to produce it, raises a presumption against them of its payment, but this is only a presumption, and it may be rebutted.

On the other hand, the burden being on the complainants to prove the fact of the payment, it was their interest to have the note, if paid, in their possession; for, from this alone, unexplained, the law would infer its payment.  In the case of the first two notes, they were, when paid, taken up by J. Knox Walker, and wrapped up in the same enclosure with the written agreement, and a memorandum of the fact and time of payment, and by whom made, was indorsed on the written agreement.  It was no less important to preserve the remaining notes, and indorse their payment on the written agreement, than the first two.  The fair presumption is, that, if they had been paid, this course would have been observed. Besides this, there is no receipt, memorandum or verbal decla-

ration proved, showing an acknowledgment of payment; nor is there a circumstance, other than the inability of the defendants to produce the note in evidence, from which it might be suspicioned the note had been paid. It is shown that, at the time this note matured, and thence until the death of J. Knox Walker, he was financially involved, living beyond his means, and giving more attention to politics than his private affairs. The ability of Samuel P. Walker to make the payment is undoubted, but it is not pretended that he did so; and if he furnished money to his brother for that purpose, the misfortune is, there is no proof either of that fact or that any other money was so applied.

On the whole, we are not clearly satisfied, from the evidence, that this note has been paid, and the case must, therefore, be disposed of, assuming that no payment was made of the last two notes.

It remains to determine whether complainants can have a decree for the property upon now paying the amount due on these notes.

The general rule is, that, to entitle a party to specific performance, he must show that he has been in no default in not having performed his part of the agreement, and that he has taken all proper steps towards the performance on his part. Story's Equity Jurisprudence, sec. 771; *Scott* v. *Shepherd,* 3 Gilm. 483; *Brown* v. *Cannon,* 5 id. 174; *Iglehart* v. *Gibson et al.* 56 Ill. 81; *Phelps* v. *The Illinois Central Railroad Company,* 64 id. 468.

Mere lapse of time, however, when time is not expressly made material by the agreement of the parties, is not necessarily an objection to decreeing specific performance; but where there is great delay, unexplained, it will itself afford such evidence of *laches* as will preclude the granting of relief. *Hough* v. *Coughlan,* 41 Ill. 133; *D' Wolf* v. *Pratt,* 42 id. 198; *Thompson* v. *Bruen,* 46 id. 125. There was here delay in paying the money last due, from the 23d day of January, 1858, and no offer was made to pay it until the filing of the supple-

mental bill, on the 21st of January, 1873, the original bill having been framed upon the single theory that the notes were paid. The excuses offered for this delay are, the great intimacy between Douglas and J. Knox Walker, the subsequent war, and the death of Walker and minority of a portion of his heirs.

The fact that Douglas and J. Knox Walker were personally intimate, and that Walker was Douglas' devoted political adherent, is proved; but does it, therefore, follow that business engagements were less binding between them, or that their mutual legal obligations towards each other were dispensed with? We think not. We do not think this paid Walker's notes, or changed their terms. It may explain why Douglas would have felt great delicacy in resorting to extreme legal measures to enforce the payment of the notes, but it did not relieve Walker from the legal and moral duty he was under of paying them, nor free his conduct, in neglecting to pay them, from the imputation of *laches.*

The fact that Douglas, on the 5th of June, 1860, pledged the last note as collateral security for the payment of the Brega check, shows, certainly, that, at that time, he did not consider the contract as rescinded; but we are unable to infer from this an intent to give an indefinite future extension of time for its payment.

The residence of both J. Knox Walker and Samuel P. Walker was Memphis, Tennessee. Communication between that point and the North was cut off, by the operations of the war, from some time in the summer of 1861 until the 6th of June, 1862, when Memphis was occupied by the government forces; but from that time forth, there was no difficulty in a citizen of Memphis having his business affairs in Chicago, or elsewhere in the North, attended to.

J. Knox Walker entered the confederate army, voluntarily, as colonel of a regiment, in the summer of 1861, and remained in it until after the battle of Shiloh, in 1862, when he resigned, and returned to his home, in Memphis, and there died in

August, 1863. His son, Hal. T. Walker, administered on his estate, and in 1866 found the written agreement between Douglas and his father, and the two notes which had been paid, in a bank in Memphis, where they had been deposited, and soon thereafter the agreement was caused to be placed on record in Cook county.   We are unable to perceive any reasonable excuse why the two notes remaining unpaid were not paid between the time they were due and the breaking out of the war, in 1861; or why they were not paid after the 6th of June, 1862, when communication was opened with the North, and before the filing of the supplemental bill, on the 21st of January, 1873, when, for the first time, it was intimated that there was any willingness to pay them.   J. Knox Walker's insolvency was no excuse.   *Milnor et al.* v. *Willard*, 34 Ill. 40. If the heirs of J. Knox Walker were ignorant of their rights and duties in this matter, who was responsible for it?   Surely, not the widow and heirs of Douglas.   But it does not appear that, if the administrator of J. Knox Walker had made proper effort to ascertain the condition of his father's estate, he would have had any trouble in finding this agreement, immediately after his death.   So far as Samuel P. Walker is concerned, it is evident that he was guilty of the grossest *laches*.   His contract was only with his brother J. Knox Walker.   There is no evidence that Douglas ever knew of this contract, and it is certain he held no written evidence by which he could have enforced payment of the notes, or any part of them, against Samuel P. Walker.   He was solvent, and able to pay, and must have known of his brother's insolvency.   If he supposed full payment had been made, why did he not interest himself to see whether the deed was executed? He must have known that the property was liable for the payment of taxes, and that his brother's title might be forfeited for their non-payment; yet it does not appear that he made any effort to procure a deed, or to see that the taxes were paid, or that he, in any way, gave the property the slightest

attention. Whatever ignorance, therefore, he had upon the subject, was wilful.

The evidence shows that J. Knox Walker caused the taxes to be paid on the property for the years 1857 and 1858, and probably 1859; but from thenceforth, he furnished no money for that purpose, and entirely ceased to pay any attention to the property. He did not put the agreement on record, or make any improvements on the property, nor was he ever in the actual possession of it.

In this connection there are two circumstances, which we deem of special importance, to be taken into consideration. In 1859 and 1860, this property had depreciated in value, and it is not shown to have appreciated any until after the close of the war, in 1865; but, since then, it has greatly increased in value. From 1857 until the death of J. Knox Walker, the evidence shows the amount of these notes could not have been collected from him by judicial proceeding, and his estate, when finally settled up, paid only about forty cents on the dollar. As before observed, Samuel P. Walker was not known to Douglas in this contract. He had neither signed nor indorsed the notes, nor in anywise become responsible, directly to Douglas, for their payment. The only written evidence of his undertaking with J. Knox Walker was indorsed on the back of the agreement. This was kept by J. Knox Walker alone, and that so closely and secretly that, it is claimed by complainants, neither his children, nor his brother, who was equally interested therein with himself, knew where it was until some three years after his death, when it was discovered, by means of a notice from an officer of the bank with which it had been deposited.

There is no evidence that the fact that Samuel P. Walker had agreed to pay one-half of these notes was ever known to Douglas, or that his widow or heirs were informed of it prior to the commencement of this suit. The property purchased was liable to fluctuations in value by the lapse of time, and it is a reasonable inference, from all the circumstances, that

the object of the purchase was speculation. Payment, therefore, could not, after the maturity of the last note, have been enforced against J. Knox Walker, by reason of his insolvency; nor against Samuel P. Walker, because it was unknown that he had assumed any liability in respect of the notes. If, then, the property greatly increased in value, complainants, by obtaining it, would have a profitable speculation; but if, on the contrary, it depreciated in value, they would suffer no loss, because payment could not be enforced. To allow the complainants, under these circumstances, now, after the lapse of such time, and in the face of such negligence, to have a decree for specific performance, would be contrary to long and well established principles of equity. Fry on Specific Performance, secs. 713, 714, 715 and 716, and notes; Story's Equity Jurisprudence, sec. 776; 1 Sugden on Vendors (8 Am. Ed.), 403; *Hoyt* v. *Tuxbury et al. ante*, p. 331.

The fact that some of the complainants are infants, is, in this view of the case, unimportant; for " an infant heir can not avail himself of his disability to excuse the non-assertion of his right, under an executory contract made with his ancestor, when the immediate performance of his part of the contract is essential to the interest of the other party." Fry on Specific Performance, sec. 620.

The application for a continuance was not based upon an affidavit showing sufficient diligence to entitle the party to the continuance. There were two modes by which the contents of the books of Riggs & Co. could have been made evidence—one by an agreement of the parties to that effect, and the other by the introduction of proper proof. Complainants resorted to neither, but relied on what they understood to be the admitted necessities of the defendants to make the proof for them. At most, the affidavit but appealed to the equitable discretion of the chancellor to grant a postponement; and that he exercised it against complainants, is not error.

The decree is affirmed.

*Decree affirmed.*