Ignatz Boskowitz *et al.*

· *v.*

Isaac G. Baker *et al.*

1. Contract — *for sale of buffalo robes, construed as to quality.* A contract for the sale and delivery of a lot or collection of buffalo robes, which provides for the payment of half price for fifteen hundred, and that no more than two hundred headless and mismatched robes shall be contained in the collection, and that the assortment shall be of good quality, does not mean that the quality shall be determined merely by comparison with other collections of the place where the vendors and vendees expected the robes were to be obtained, but that it shall be an average good collection as known to the trade, in the market.

2. Where a contract for the sale and delivery of an entire collection of buffalo robes by an Indian trader provides for the payment of $6 for each robe on delivery, except fifteen hundred, for which $3 each is to be paid, they "being supposed to be of an inferior quality," and further provides that the "assortment" shall be of good quality, those of inferior quality will be limited to fifteen hundred, and a tender of a greater number of inferior ones will not be a compliance with the undertaking of the vendors.

Appeal from the Superior Court of Cook county ; the Hon. Joseph Sibley, Judge, presiding.

J. & A. Boskowitz, the appellants, sued I. G. Baker & Bro., the appellees, upon the following contract, to wit :

" We, J. & A. Boskowitz, of Chicago, Illinois, have this day purchased of I. G. Baker & Brother, of Fort Benton, Montana Ter., their entire collection of buffalo robes, amounting to 18,000 skins, and for which we agree to make a payment of $5,000 upon the signing of this contract, and upon delivery of the buffalo robes, to complete the payment, the said delivery to be completed on or before September 1st, 1871.

" We, J. & A. Boskowitz, agree to pay for these buffalo robes, delivered to them at Chicago, $6 each, except for 1500 robes of this collection, which are to be deducted from the total

number, and for said 1500 robes we agree to pay $3 each, these being supposed to be of an inferior quality; and for buffalo robes known as black calf, we agree to pay $3 each; and it is mutually agreed that no more than 200 headless and mismatched robes shall be contained in the collection.

" I. G. Baker & Brother agree the assortment of Buffalo robes shall be of good quality.

" We, J. & A. Boskowitz, agree to pay $3 each for all sound wolf skins, excluding stagy skins, delivered in Chicago, on or before September 1st, 1871. The quantity to be delivered by I. G. Baker & Brother, to be not less than 3000 skins, and not to exceed 5000 skins. Signed and sealed at St. Louis, April1 9th, 1871."                    (Signed by the parties.)

I. G. Baker & Bro.'s entire collection of buffalo robes for the season of 1871 was shipped from Fort Benton as follows: On May 18, 1871, one thousand bales; on May 31, 1871, twelve hundred and eighty-five bales; and on July 2, 1871, one hundred and ninety-five bales; the bales averaging about ten robes each. They forwarded the two thousand two hundred and eighty-five bales shipped on the 18th and 31st of May to Chicago, for delivery to J. & A. Boskowitz. The remaining one hundred and ninety-five bales were shipped from Sioux City to St. Louis, and did not arrive there until Sept. 1, 1871. These last, comprising about eighteen hundred robes, were collected by Baker & Bro. of the Crow Indians, and were in quality superior to those shipped to Chicago and tendered to J. & A. Boskowitz.

On the 10th day of July, 1871, I. G. Baker, out of the shipments of May 18 and 31, made a tender to J. A. Boskowitz, at Chicago, of twenty thousand four hundred and odd buffalo robes, and insisted upon their taking the whole lot thus tendered or none, and declined to let them have any buffalo robes or wolf skins, unless they would receive the entire lot so tendered. Out of the robes tendered, J. & A. Boskowitz offered to receive, and tendered pay for, eleven thousand six hundred

34—74TH ILL.

and eighty-five as of good quality; two hundred headless and mismatched, otherwise of good quality; four hundred and sixty-nine black calf, as of good quality; and fifteen hundred of inferior quality; in all thirteen thousand eight hundred and fifty-four robes. They also tendered pay for all the wolf skins, as to the quality of which there was no disagreement. Subsequent to the execution of the contract the following correspondence was had between the parties.

On the 16th of May, 1871, I. G. Baker wrote from St. Louis to J. & A. Boskowitz as follows:

"In the letter from my brother at Fort Benton, he says: ' I am satisfied we will have 20,000 robes, and the probability is it will be 21,000, and that there will be 6,000 wolves; our contract says 18,000; do you want them all, both robes and wolves?' He says there will be kit, fox, elk and antelope, and but very little beaver. Will you please give us figures on the last mentioned."

The reply is:

"May 17, 1871.

" We will consult our firm in New York on the points mentioned, and write you again when we hear from them, say about 21st or 22d inst. In all probability we will take the entire collection; will write you prices for the other skins in our next. Will you please inform us, whenever you receive advice to the effect from your brother, on what boat the robes are coming down, and when they may be expected, so that we can make our arrangements accordingly?"

And on the 22d of May, 1871, they again wrote further in answer as follows:

" We wrote you last on the 17th, which letter we presume you have received; your collection of robes turn out much larger than you anticipated, and we hope their quality and assortment will not be indiscriminate; on this presumption

we will take the additional 2,000 or 3,000 robes, and also the 1,000 wolf skins."

To this last letter Baker & Bro. did not reply.

The declaration alleged a breach of the contract by the defendants, and a part performance and a tender as to the balance by the plaintiffs. The plea was the general issue. The verdict and judgment were for the defendants, and the plaintiffs appealed.

The appellants allege error in the court below in these particulars:

First. Error was committed in the construction placed upon the contract.

Second. The offer to perform by the defendants was not in conformity to the contract.

Messrs. GOODRICH & SMITH, for the appellants.

Messrs. GOUDY & CHANDLER, for the appellees.

Mr. JUSTICE SHELDON delivered the opinion of the Court :

The chief question here arises upon the construction of the contract of April 19, 1871, with reference to the quality of the buffalo robes.

The appellants insist that by this contract all except fifteen hundred of the eighteen thousand robes were to be of good quality, as known to the trade generally, and without reference to the place where collected ; that the number of robes of inferior quality by the agreement is definitely limited to fifteen hundred, as much so as the headless and mismatched robes are to two hundred.

On the contrary, it is claimed by the appellees that this contract only called for an original unassorted Fort Benton collection of robes, which, as an entire collection, would average as good in quality as Fort Benton collections generally ; and that, tested by this standard, whatever the number of inferior robes, J. & A. Boskowitz were bound to receive them, paying

half price for fifteen hundred, and full price of good robes for the residue.

In refusing the first, second, third and fourth instructions asked by the plaintiffs, and in giving the fourth instruction asked by the defendants, the court below rejected the construction claimed by the appellants and followed that claimed by appellees. The fourth instruction given for the defendants was as follows:

"4. If the jury believe, from the evidence, that the defendants' collection of buffalo robes, referred to in the contract, were gathered or collected at Fort Benton, Montana Territory, and that the defendants were ready and willing, and offered to deliver to the plaintiffs, their entire collection, not less than 18,000 in number, in July, 1871, and that such entire collection or assortment was of good quality (having reference to entire collections from Fort Benton in determining the question of quality), provided that at the time of the execution of the contract in evidence the plaintiffs knew that the collection was to be made at that place, and that no more than two hundred headless and mismatched robes were included among such collection of not less than 18,000, and that at the same time the defendants were ready and willing and offered to deliver to plaintiffs sound wolf skins to the number required by the contract (admitted by plaintiffs to be according to the contract), then the plaintiffs cannot recover in this case, and the jury must find for the defendants."

For the purpose of a better understanding of the phraseology of the contract, it may be proper to advert to certain facts and circumstances relating to the subject matter which appear in evidence.

The buffaloes are killed by the Indians, who dress and sell the skins to Indian traders. These Indian traders are the original collectors, and the lots obtained by them in any one season are called original collections. The Indian trader sells to the wholesale dealers, the latter to the jobbers, and the jobber sells to the retail dealer. The defendants devoted them-

selves to the first branch of the trade, and confined themselves to the making of original collections and selling them to the wholesale dealers, and the plaintiffs limited their operations to the second branch of the trade, as wholesale dealers.

The defendants had a house at Fort Benton, on the upper Missouri, where they made their collections by purchases from the Indians. The plaintiffs had a house in Chicago, and another in New York, most of their sales being made in New York.

Original collections of robes and skins are made on the upper Missouri, the lower Missouri, on the plains and on the Arkansas. Those collected on the plains are superior in quality. The Missouri river Indians "cut their robes in half previous to dressing, while those of the plains leave their robes whole." In original unassorted collections from Fort Benton there is usually a greater percentage of inferior robes than in original collections from the plains or the lower Missouri. In purchasing from the Indians, no difference is made in price for quality of robes, "their ideas of trade (in the language of the witness) not going to the extent of different prices for different qualities, and the price of robes is fixed without reference to quality, at so many cupsful of sugar or coffee, or so many arms-lengths of cloth, etc., for each robe." An original collection has all kinds of robes and is unassorted. Before the robes are ready for the wholesale and retail dealers, the collection must be assorted into various grades, according to kinds, size and quality. The robes are first assorted with four grades, according to value, and known as Nos. 1, 2, 3, 4. These are classified in various sub-grades, numbering as high as forty. Grades Nos. 1, 2 and 3 are, as a whole, considered by the trade as of good quality. Those robes falling below grade No. 3, and into grade No. 4, are considered by the trade as robes of inferior quality. Nos. 1, 2 and 3 are robes fit for sleigh and carriage purposes, and No. 4 are those unfit for carriage purposes, and principally used for making into overshoes, and called sometimes shoe-robes.

In making these assortments of original Indian collections, no different standard is adopted, and no distinction is made, between Fort Benton collections and collections from other regions; a robe of good quality would be the same from any section, and so of an inferior robe.

We find no testimony in the record tending to show that in dealing in robes either Indian traders, wholesale dealers or jobbers buy or sell or fix prices in the market with reference to the locality where the skins are originally collected; but the skins must stand upon their merits under a uniform standard as to quality.

Assuming appellees' construction to be correct, that Baker & Bro.'s stipulation that the assortment of buffalo robes shall be of good quality, means simply, that this collection, as a whole, shall be of good quality, we cannot accede to the view that its quality should be determined merely by comparison with other Fort Benton collections. There is no such qualification to be found in the words of the contract; and we cannot think there is any such implied qualification from this being a Fort Benton collection, and it being understood and expected that Baker & Bro. would, in fact, collect all their robes for that season at that place. We are very clearly of the opinion that in that case the requirement would be that it should be an average good collection as known to the trade and in the market, without reference to the particular point where these skins may have in fact been collected. The witness Boughton, in speaking of original collections generally, says that "in an entire unassorted lot of buffalo robes, assuming that the entire collection is of good quality, there should be eighty-five per cent of Nos. 1, 2 and 3, and fifteen per cent of poor robes."

The witness Gage also says: "I would include in an entire unassorted lot of buffalo robes of 18,000 supposed to be of good quality, all grades, except No. 4, in these proportions: Ninety-five per cent of Nos. 1, 2 and 3, and five per cent of No. 4."

These two witnesses appear to be the only ones who testify on this point as to the percentage of inferior robes which an average good original collection should contain.

And their testimony shows clearly that these robes were not up to such a standard. Of the robes tendered, about one-third would appear to have been robes of inferior quality, of grade No. 4.

In this respect at least we regard the defendants' fourth instruction and the finding of the jury as wrong.

This would cause a reversal, and is sufficient for the present disposition of the case, but for the future guidance of the parties, perhaps, we should not stop short of settling the whole question which is raised on the construction of this contract.

The further question is more doubtful, whether, according to the terms of this contract, the number of robes of inferior quality was not to exceed 1,500, and that 16,500 robes were to be all of good quality; or whether the entire collection was to be of good quality, and appellees had the right to put more than 1,500 robes of inferior quality in the collection, if that did not thereby change the quality of the entire collection from good to bad. The second paragraph in the contract is the one that fixes the price of the robes; and looking at this by itself, the first clause would rather seem to be a contract to pay for all the buffalo robes sold six dollars each, except 1,500 of them for which three dollars each was to be paid. Yet there is used in immediate connection with the number 1,500, the language " these being supposed to be of an inferior quality." This tends to indicate the intention to pay only three dollars each for robes of an inferior quality. Then comes the succeeding paragraph: "I. G. Baker & Brother agree the assortment of buffalo robes shall be of good quality." The two paragraphs are to be construed in connection with each other.

What was here agreed to be of good quality, the entire collection, as compared with other collections, or the portion of the robes appellants were to pay six dollars each for?

The terms "good quality" and "inferior quality" appear to have been well known to the trade as designating two well-defined separate classes of robes. The difference between the prices for robes of inferior quality and the other robes is recognized by the parties as one-half, three dollars each for the former, and six for the latter; and this appears to be about the average relative difference of value between the two classes. The parties, from their familiarity with the trade, knew that the actual number of the robes of inferior quality could not be fixed, that it was uncertain, and not capable of ascertainment there, at St. Louis; and they must have known that there would be a larger number of them than 1,500 in the collection. Boskowitz testified that the actual number of the inferior robes in this case was 6,774; and the testimony concurs that this lot as a whole was a fair, average good Fort Benton collection.

It is quite unreasonable to suppose that it was intended that J. & A. Boskowitz should pay the full price of good robes for an indefinite and, in all probability, much larger number of inferior robes in addition to the specified 1,500. It was agreed that there should be no more than 200 headless and mismatched robes which, otherwise, would grade with robes of good quality. And we would be slow to believe that appellants, while stipulating to exclude quantities of headless and mismatched robes, were still willing to include a large number of robes much inferior at a price they were unwilling to pay for these headless and mismatched ones. Such considerations, of course, do not control, but they may help in solving an ambiguity.

The agreement then is, that the assortment of buffalo robes shall be of good quality. Before, in the writing, whenever speaking of this lot of robes, it is called a "collection." That word is so used three times before. But here, it is dropped, and "assortment" is used. It is not likely the change of term was accidental with these men, conversant with the terms used in their trade, one of whom, Boskowitz, drafted the in-

strument. The difference between an assortment and an orig-
inal Indian collection, as has been shown, is marked. The
entire collection evidently was not to be taken; the number
to be taken was eighteen thousand skins, and the parties in
their subsequent correspondence recognize this limitation; and
the stipulation that there were not to be more than two hundred
headless and mismatched robes, shows the entire collection
was not to be taken. There were actually in this case two
thousand one hundred and seventy of these headless mis-
matched robes. The contract calls for a fixed number of
robes, to be selected or assorted, from Baker & Bro.'s original
Indian collection. We cannot yield to appellees' construction
that "assortment" is used as synonymous with "collection;"
but we consider the agreement that the assortment should be
of good quality, one, that the robes of the *assortment* should
all be of good quality, which, taken together with the pre-
ceding paragraph, would mean that they all should be of good
quality, except one thousand five hundred, which might be of
inferior quality. And perhaps this is no more than what
should be the implication from the preceding paragraph. By
specifying one thousand five hundred only, as being of inferior
quality, and valuing them at half price in consequence, it
might be implied that all the other skins not specified as infe-
rior, and valued at the full price of good skins, were to be of
good quality. So that upon the construction of the whole
instrument taken together, in the light of the surrounding
circumstances, we are inclined to hold that the contract placed
a limitation of one thousand five hundred on buffalo robes of
inferior quality. It must be confessed the parties have ex-
pressed such meaning quite awkwardly; but we must accept
the language they have seen gt to employ, and construe it as
we best can.

Under this view, there was further error in refusing the
first, second, third and fourth instructions asked by the plain-
tiffs, or some one of them, as they put that construction upon

35—74TH ILL.

the contract which we adopt. The judgment is reversed and the cause remanded.

*Judgment reversed.*

Mr. CHIEF JUSTICE WALKER: I am unable to concur in the construction given to the contract in this case, and hold the judgment should be affirmed.

Mr. JUSTICE CRAIG: I do not concur with a majority of the court in the decision of this cause.

Mr. JUSTICE SCHOLFIELD: I dissent from the views expressed in the foregoing opinion.