Chicago Wharfing and Storage Company, a Corporation, v. Charles A. Street et al.

1. CONTRACTS—*Intent of the Parties in Construing.*—The intent of the parties is what the courts endeavor to arrive at in construing contracts. For this purpose a court will place itself in the shoes of the parties, that, viewing the subject-matter from their standpoint, it may be able to read the contract in the light under which it was consummated.

2. CONSTRUCTION—*Of Contracts—Conduct of the Parties.*—The subsequent conduct of the parties to a contract in respect to the matters concerning which it treats, will be looked into as affording evidence of the meaning which the contracting parties themselves attached to it.

3. SAME—*Understanding of an Adversary.*—Where the terms of an agreement are open to construction, a party may be held bound to the understanding which he knew his adversary had of the contract, but the rule does not apply, if the contract is in writing and its terms unmistakable.

**Memorandum.**—Bill to reform a contract. Error to the Circuit Court of Cook County; the Hon. THOMAS G. WINDES, Judge, presiding. Heard in this court at the March term, 1894. Reversed with directions. Opinion filed April 5, 1894.

### STATEMENT OF THE CASE.

Plaintiff in error was the owner of certain dock property in Chicago, subject to a leasehold interest of Walter Shoemaker & Co., such leasehold beginning May 1, 1887, and ending April 30, 1892.

Shoemaker & Co. had placed on the property a large amount of planking for driveways and sorting platforms, and had erected fences, lumber sheds, and laid foundation timber for piling lumber. The lease to Shoemaker & Co. provided that, in case the lease should not be renewed, that the lessor should, at its expiration, purchase the planking on the premises, and pay therefor the valuation made by three appraisers.

Street, Chatfield & Co. negotiated for a lease of the premises for a term beginning May 1, 1892, and their attention was called to the provision in the Shoemaker lease requiring the lessor to purchase the planking, and the lease was shown to them.

The negotiations with Street, Chatfield & Co. were made on behalf of the company by Galloway, who is its treasurer, and on behalf of Street, Chatfield & Co., by Street.

Galloway stated to Street the provisions of the Shoemaker lease; that Street or the company should take the planking at the expiration of that lease at an appraised value, at the same time saying that he, Galloway, would lease the property to defendants in error for $5,400 a year, providing defendants would take the planking as provided in the lease. Street, in answer to that proposition, said he would like to negotiate with Shoemaker for the lumber shed,

stable, fencing and some other things that they had on the ground, which were not included in the arbitration agreement, and that while he (Street) was negotiating for these he might make an arrangement to purchase the planking. Galloway said he had no objections to his buying the planking by private trade; that "he could either buy it or take it at the appraised value." Street said he would take the premises on the terms named. They then put their agreement into writing. The agreement as written contains the following clause: "The party of the second part (Street, Chatfield & Co.) shall be entitled to take the planking now on said ground, belonging to Walter Shoemaker & Co., at the appraised value, as provided in the lease between James B. Galloway and Walter Shoemaker & Co., or to purchase said planking direct from said Walter Shoemaker & Co., and at the expiration of the lease hereby agreed to be made, the first party agrees to purchase the planking on said yard of Street, Chatfield & Co., at its then appraised value, to be appraised as follows: "Each of the parties to said lease shall select one appraiser, and if these two can not agree, they shall select a third appraiser, and a majority of the three so chosen shall decide the value of said planking."

After this agreement was made, Street negotiated with Shoemaker & Co., and bought the lumber shed, fencing and other property on the premises, but they could not agree on the price for the planking. Street then requested an immediate appraisal. Appraisers were appointed, but the one selected by Galloway declined to act, and Street then said he would himself get a man who would be acceptable and would make a good appraiser. Street informed Galloway of the time set for the appraisal and requested him to be present. On April 7, 1892, Street introduced Galloway to Holtmeier, the appraiser selected by Street, and an appraisal was made the same day. The price placed on the planking was almost $500 more than the amount for which it had been offered to Street by Shoemaker & Co. Galloway left while the appraisers were at work, but Street remained until an appraisal was made.

The next day Street called on Galloway, and said the appraisal was too high, but he was willing to pay the amount for which it had been offered to him.    Shoemaker & Co. refused the offer.

Leases were drawn and tendered to Street, Chatfield & Co., in accordance with the agreement referred to, a provision being inserted that Street, Chatfield & Co. should pay the appraisal.    They declined to sign the leases.

On May 1, 1892, Street, Chatfield & Co. took possession of the property and the planking and are using the same in their business.    On May 2, 1892, they sent the complainant notice to remove the planking.    The original bill of complaint was filed on May 13, 1892.

A second amended bill was filed, praying for a reformation of the contract and for specific performance.

Defendants answered, admitting all the material allegations of the bill, denying, however, that Street, Chatfield & Co. were bound to take the planking, and further that no mistake was made in the reduction of the agreement to writing.

A reference to a master in chancery was had, and testimony was taken.    On the close of complainant's evidence, the master recommended the dismissal of the second amended bill for want of equity.    And the court so ordered.

BRIEF OF PLAINTIFF IN ERROR, ADOLPH TRAUB, ATTORNEY.

If there is an error in the reduction of an agreement to writing, so that the written agreement fails, through some mistake of the draughtsman, or of the parties, to represent the real agreement of the parties, a court of equity will reform the agreement so as to make it express the real intention of the parties.    Kerr on Fraud and Mistake, 418–419; Pomeroy's Eq. Jur., 11, Sec. 845; Bishop on Contracts, Sec. 707; Ball v. Storie, 1 Simons & Stuart, 210; Glass v. Hulbert, 102 Mass. 24; Green v. Railroad Co., 12 N. J. Eq. 166.

Mistake, within the meaning of equity and as the occasion of jurisdiction, is an erroneous mental condition, conception or conviction, induced by ignorance, misapprehension

or misunderstanding of the truth.    Pomeroy's Eq. Jur., 11,
Sec. 839; Bishop on Contracts, Sec. 465.

The mistake in the agreement in this case is one which
equity will reform, whether it be called a mistake of law or
of fact.    Pomeroy's Eq. Jur. 11, Sec. 842, 845, 847; Brown's
Parol Ev., Sec. 44 and p. 80; Am. & Eng. Ency. Law, XV, p.
643–644; White & Tudor's Leading Cases, Pt. 1, p. 985;
Hunt v. Rousmanier, 8 Wheaton, 174; Bishop on Contracts,
Sec. 465; Beardsley v. Knight, 10 Vt. 185; Kennard v.
George, 44 N. H. 444; Bush v. Merriman, 87 Mich. 260;
Stedwell v. Anderson, 31 Conn. 144; Remington v. Higgins,
54 Cal. 622.

Defendants are guilty of inequitable conduct in taking
advantage of the mistake in the written contract.    Green-
leaf on Ev., 15th Ed. 111, Sec. 363; Pomeroy's Eq. Jur. 11,
Sec. 847.

BRIEF OF DEFENDANTS IN ERROR, S. M. MILLARD, ATTORNEY.

The rule is well settled that a simple mistake of a party as
to the legal effect of an agreement which he executed, or as
to the legal result of an act which he performs, is no ground
for either defensive or affirmative relief.    If there were no
elements of fraud, concealment, misrepresentation, undue
influence, violation of confidence reposed, or other inequi-
table conduct in the transaction, the party who knew or had
an opportunity to know the contents of an agreement or other
instrument, can not defeat its performance or obtain its can-
cellation or reformation, because he mistook the legal mean-
ing and effect of the whole or any of its provisions.

Where the parties with knowledge of the facts, and with-
out any inequitable incidents, have made an agreement or
other instrument as they intended it should be, and the
writing expresses the transaction as it was understood and
designed to be made, then the above rule uniformly applies;
equity will not allow a defense or grant a reformation or
rescission, although one of the parties—and as many cases
hold, both of them—may have mistaken or misconceived
its legal meaning, scope and effect.    Pomeroy's Eq., Secs.
842, 843; also Note 1.

To this general rule exceptions exist, as, for instance, after making an agreement, if in the process of reducing it to writing a mistake is made by the scrivener, who fails to express what the parties agreed upon, or where the mistake is common to both parties, such as where they act under some misapprehension of the legal effect of the transaction, or where there is a misconduct on the part of one of the parties, or some other reason whereby an inequitable situation is created, arising from misunderstanding the facts or the intentions of the parties, equity has in many cases granted relief; but this exception is only allowed to interfere with the general rule where it clearly appears from the evidence in the case that some state of facts existed which misled the parties; but where the parties, knowing all the facts and familiar with the situation of all the circumstances, deliberately enter into an agreement, especially where the party complaining was learned in the law, as well as familiar with the facts, courts do not apply any exceptions to the general rule. Pomeroy's Eq., Secs. 844, 845, 846 and 847; Arter v. Cairo Democrat Co., 72 Ill. 434; Broadwell v. Broadwell, 1 Gilm. 599; Beebe v. Swartwout, 3 Gilman, 162; Coffing v. Taylor, 16 Ill. 456; Ruffner v. McConnell, 17 Ill. 212; Wood v. Price, 46 Ill. 439; Goltra v. Sanasack, 53 Ill. 456; Bonney v. Stoughton, 122 Ill. 536; Stodalka v. Novotny, 144 Ill. 125; Crum v. Sawyer, 132 Ill. 457.

The strongest and most convincing evidence will be required before the common law rule is postponed and the power of the court exercised. Hunter v. Bilyeu, 30 Ill. 228.

Charges of fraud must be clear and specific. City of St. Louis v. Millard, 14 Brad. 432; Hamlon v. Sullivant, 11 Brad. 432; Emery v. Mohler, 69 Ill. 222; Sutherland v. Sutherland, 69 Ill. 482; Dinwiddie v. Self, 145 Ill. 291; Hunter v. Rousmaniere, Adm., 1 Pet. 1.

MR. JUSTICE WATERMAN DELIVERED THE OPINION OF THE COURT.

The only matter in dispute in this case is whether the defendants are bound to take and pay the appraised value

of the planking, or may decline to take the planking at all. The intent of the parties is the thing at which courts endeavor to arrive in construing contracts. For this purpose the court will place itself in the shoes of the parties, that, viewing the subject-matter from their standpoint, it may read the contract in the light under which it was written. 2 Kent, 555; Boskowitz v. Baker, 74 Ill. 264; Doyle v. Teas, 4 Scam. 202–256; Walker v. Douglas, 70 Ill. 445–448.

The whole instrument is to be viewed and compared in all its parts, so that every part of it may be made consistent and effectual. 2 Kent's Com. 555.

*Qui hæret in litera hæret in cortice*—he who considers only the letter sticks in the bark—is a maxim which should not be forgotten in the consideration of the instrument signed by these parties.

The subsequent conduct of the parties under the contract in respect to the matters concerning which are its stipulations, will be looked to as affording evidence of the meaning which the contracting parties attached to the instrument they made. Chicago v. Shelden, 9 Wallace, 50–54; Coleman v. Grubb, 23 Penn. St. 393–409; Jackson v. Perrine et ux., 35 N. J. L. 137; Stone v. Clark, 1 Met. 378; St. Louis Gas L. Co. v. The City, 46 Mo. 121; Seavers v. Cleary, 75 Ill. 349; Wilson v. Marlow, 66 Ill. 385.

Illumining the agreement by these well known rules of construction, and it is manifest that the defendants understood that they had agreed to do one of two things, viz., to take the planking then on the ground, belonging to Walter Shoemaker & Co. at the appraised value as provided in the lease between Galloway and Shoemaker & Co., or to purchase said planking direct from said Shoemaker & Co. Defendants not being able to agree with Shoemaker & Co. as to the price to be paid for the planking, requested an appraisal of the same. In accordance with such request an appraisement was had, one of the appraisers being selected by defendants.

The defendant attended throughout the appraisal, but when it was declared and was found to be $500 more than

the price for which Shoemaker & Co. had offered to sell the planking, defendants then declined to pay the sum so fixed, but offered to give the price at which, before the appraisal, Shoemaker & Co. had offered to sell. Shoemaker & Co., very naturally, refused to take less than the amount of the appraisal.

Defendants, by requesting an appraisal, selecting an appraiser and attending when the appraisal was being made, clearly indicated their understanding that having failed to agree with Shoemaker & Co., they, defendants, were to take the planking at the price that should be fixed by appraisal.

Their conduct in this regard was meaningless, not to say absurd, if the result of such appraisal was to them a matter of no consequence, a thing by which they were in no wise bound. There can be no doubt that if the appraisers had found the value of the planking to be $500 less than the sum for which Shoemaker & Co. had offered to sell, defendants would have insisted upon their rights to take the same at the appraisal.

Defendants well knew how plaintiff understood the agreement; they had heard Galloway state the terms upon which he would make a lease, and while they may not directly have stated that they assented thereto, they had expressed no dissent, and proceeded to sign an agreement drawn up by Galloway after making such statement, in which Galloway told them that he would lease the property to defendants for $5,400 a year, providing defendants would take the property as provided in the lease to Shoemaker & Co. The agreement thereafter signed provided for a lease at $5,400 a year, and contained the stipulation as to the planking hereinbefore mentioned.

Where the terms of an agreement are open to construction, a party may be held bound to the understanding which he knew his adversary had of the contract. Wells v. Carpenter, 65 Ill. 447; 2 Kent's Com., 557.

If the terms of the writing signed by the parties were unmistakable, the foregoing rule of construction would not be applicable; but the agreement viewed from the stand-

point of the parties is not, as is contended by defendants, clearly to the effect that they were under no obligation to take the planking upon any terms. It is not denied that the agreement shows that when it was made plaintiff was bound to purchase the planking, then on the premises, at a value to be fixed by appraisement; that defendants, the lessees, were to pay taxes upon the improvements; that plaintiff at the expiration of defendants' lease should purchase from them the planking on the premises at its then appraised value.

Looking at the written agreement alone, it may be said to be uncertain whether defendants were bound to take the planking under one of two ways for fixing its price, or might decline to take it at all. Regarding the contract from the standpoint of the parties and their subsequent conduct, we have no doubt as to its meaning.

By the agreement of the parties, the defendants became bound when the appraisal had been had to discharge the obligation of plaintiff, Shoemaker & Co., in respect to the planking.

As between plaintiff and defendants as to the obligation to pay Shoemaker & Co., the defendants were their principals, and plaintiff surety; plaintiff could therefore maintain a bill to compel the defendants to discharge their obligation to Shoemaker & Co. Brandt on Guaranty and Suretyship, Sec. 223; Moore v. Topliff, 107 Ill. 241.

We do not think it necessary that any reformation of the instrument signed by the parties be made; plaintiff in error is entitled to relief upon the case it has made. The decree of the Circuit Court will be reversed, with directions to enter a decree directing the defendants to pay into court the appraised value of the planking as found by the appraisers, with interest thereon at five per cent per annum from May 1, 1892, and to execute a lease of said premises in accordance with the instrument signed by the parties, bearing date February 2, 1892, the same to be prepared and executed by the plaintiff.

If plaintiff in error shall present to the Circuit Court sat-

isfactory evidence that it has discharged its obligation to Shoemaker & Co. in respect to said planking, plaintiff will then be entitled to the money, to be paid into court on account thereof by defendants in error. Reversed with directions.