CENTRAL APPALACHIAN CO., Limited, v. BUCHANAN et al.

(Circuit Court of Appeals, Sixth Circuit. April 14, 1896.)

No. 353.

LEASE OF COAL MINES—DEPENDENT AND INDEPENDENT COVENANTS.

A lease of coal lands required payments quarterly of royalties on the tonnage mined, the lessee being bound to pay on a certain minimum tonnage, whether actually mined or not. At the time of the lease two mines already had railroad connections, and the lessor covenanted within six months after demand to extend the road to a new mine which was to be opened, also to make certain other extensions within periods ranging from a year to 18 months; and for any default as to such extensions the lessee was authorized to terminate the lease. *Held* that, as the minimum royalties were to become due, in part, before performance by the lessor of its covenants to make the extensions, such covenants were to be regarded·

as independent of the covenants to pay royalties, and the lessor's failure therein was no defense to an action for minimum royalties which became due prior to a termination of the lease by the lessee.

In Error to the Circuit Court of the United States for the District of Kentucky.

This was an action to recover an amount claimed as rent alleged to be due under a contract of lease made by the Southern Land Improvement Company, a Kentucky corporation, to the Central Appalachian Company, Limited, a corporation organized under the laws of the kingdom of Belgium. The former hereafter will be referred to as the "Improvement Company," and the latter as the "Appalachian Company." The defense was that the plaintiff, as lessor, had failed to comply with a covenant, contained in the lease, respecting the construction of a railroad, hereafter to be more fully described, compliance with which was claimed to be a condition precedent to the payment of anything by the lessee under the contract. The only question presented by the record and the assignments of error is whether the covenant referred to was a dependent or independent covenant. The leasing clause of the contract was as follows:

"For the consideration of one dollar to the first party hereto in hand, and other valuable considerations secured to its satisfaction, and upon the terms and conditions and stipulations herein set forth, the Improvement Company has demised and leased, and does hereby demise and lease to the Appalachian Company, for the period of ten years from and after the 13th day of October, 1892, with privilege of renewal of ten years longer in manner and form as hereinafter described, the mining rights and privileges as hereinafter set forth in all those certain lands belonging to the Improvement Company, situate in Bell county, Kentucky, and lying on or near the waters of the Right Fork and Left Fork of Straight creek and its tributaries, which lands are more particularly described as follows."

Then follows a minute description of the lands. The lease then proceeds:

"The buildings and improvements on these lands have been sold and conveyed to E. H. Patterson by an instrument of even date herewith, which is referred to for particulars, and said buildings and improvements are excepted from this lease. The mining rights and privileges hereby granted, the consideration therefor, and the terms, conditions, and stipulations upon which the same are granted, are as follows, to wit: (1) During the term of this lease, the Appalachian Company shall have the exclusive right and privilege of mining coal and making coke from any and all coal beds, coal seams, and coal deposits constituting the coal mines on or that are situate within or upon the lands of the Improvement Company hereinabove described and leased, and of selling or otherwise disposing of the product of said mines so obtained by it; such right and privilege to extend to the mining of all coal that said Appalachian Company may desire or be able to take from said mines. (2) To enable said Appalachian Company to exercise its mining rights and privileges it shall have the following further rights and privileges."

Then follow 13 different paragraphs detailing the additional privileges conferred by the lease. They included the right to use all existing entries or mine openings, and to open such new entries as the lessee might desire, and to erect, maintain, and operate the same; to erect coke ovens on the lands; to erect miners' houses and outbuildings and other necessary structures for mining, shipping, and distributing the coal; to take from the land all stone necessary to be used in the building of coke ovens and other necessary improvements; to take fire clay and limestone as might be needed for this purpose; to take limestone for the production of lime to be used in the construction of such structures; to cut and use nonmerchantable hardwood timber for the same purpose; to use the water of Straight creek as might be necessary in the conduct and operation of the business of mining and coking coal and disposing of the same: to lay over said lands such railways as might be necessary; and to have free passage over the surface of the land as might be necessary or convenient for the work of mining and distributing coal. The tenth paragraph was as follows:

"The Improvement Company shall furnish to the Appalachian Company copies of its plats and maps showing the workings of the mines hitherto open-

ed, and that said mines now opened near the coke plant on said lands are hereby guarantied by the Improvement Company to be in good workable condition without further repair being necessary from any existing cause or defect."

In the thirteenth paragraph the Improvement Company leased some further lands for the same term to the Appalachian Company, and gave it the right to erect factories and to conduct any business or enterprise thereon which it might see fit to establish. The fourteenth paragraph was:

"The right is hereby granted to the Appalachian Company to use during this lease the openings and passageways, tracks and appliances in and through any mine opened or that may be opened under this lease on the leased premises, for the purpose of taking coal from other lands of the Appalachian Company or from the lands of others lying adjoining the leased lands on which said mines are situated, even though the coal in the said mines on the leased premises herein may have been exhausted."

The compensation to be paid by the Appalachian Company was provided as follows:

"The Appalachian Company shall in each year cause to be taken from the mines on the above-described property a quantity of coal not less than the number of tons herein specified.—a ton being estimated at 2,000 pounds.—to wit: During the first year of this lease, 250,000 tons; during the second year of this lease, 300,000 tons; during the third year of this lease, 350,000 tons; during the fourth year of this lease, 400,000 tons; during the fifth year of this lease, 450,000 tons; and during each year thereafter, not less than 450,000 tons. The Appalachian Company shall pay to the Improvement Company on all coal, whether bituminous or cannel, taken from said mines, a royalty of not less than ten cents per ton of two thousand pounds, up to the minimum amount required to be mined in each year, and upon any excess mined in any year over and above the minimum provided for that year, the royalty to be so paid as above, shall be six and one-fourth cents per ton. If in any year the amount so mined shall fall below the minimum provided for that year, the Appalachian Company shall nevertheless pay to the Improvement Company a sum as royalty equal to the amount which might be realized by said minimum at the rate of ten cents per ton."

The Appalachian Company was required to pay the taxes and other legal assessments during the term. The royalties as above provided were to be paid as follows:

"Upon all coal taken from the mines between the first day of December and the last day of May, both inclusive. in each year, the royalty shall be paid on the last day of June following; and upon all coal taken out between the first day of June and the last day of November, both inclusive, in each year, the royalty shall be paid on the last day of December following."

The guaranty with respect to the railroad was as follows:

"The Improvement Company undertakes and guaranties that said railroad company [that is, the West Virginia. Pineville & Tennessee Railroad Company], together with the Improvement Company, will make, execute; and deliver to said Appalachian Company, and that said railroad company will duly perform, a contract in substance as follows, to wit:

"(1) That the railroad company, within six months after demand made by the Appalachian Company, will extend its existing line of railroad from its present terminus near the Improvement Company's ovens up the Right Fork of Straight creek to a point opposite such new coal-mine opening or openings as may be made by the Appalachian Company; the length of such extension, however, not to exceed one mile, unless the Railroad Company shall desire to extend further, and the location thereof to be on either side of Straight creek as the Railroad Company may determine.

"(2) That on or before January 1, 1894, from this date, the railroad company will build and complete, ready for use, a line of railroad connecting with its present track, at a point near the junction of the Right and Left Forks of Straight creek, and extending thence up said Left Fork to a point at or near the mouth of Long Branch.

"(3) That within six months after the completion of said road to Long Branch the Railroad Company will extend its road up said Left Fork to a point at or near the mouth of Sim's Fork, said road throughout to be of standard gauge, and with reasonable and practicable grades and curves.

"(4) That the railroad company will maintain and keep in reasonably good repair its said railroad, constructed and to be constructed as above mentioned.

"(5) That upon completion of said railroad to Long Branch the Appalachian Company will at once open a mine or mines on the lands of the Improvement Company above described, near or accessible to such extension, where it may be found practicable, and coal in workable quantity and marketable quality, and will mine therefrom continuously during this lease an amount of coal not less than at the average rate of two hundred and fifty tons per day from the time of such completion; and when said railroad shall have been extended to Sim's Fork the Appalachian Company shall in like manner mine from said lands lying on the line of the branch extending up said Left Fork, if to be found practicable, and in workable quantity and marketable quality, not less than fifty additional tons of coal per day from the time that said extension is completed to Sim's Fork, but these quantities not to increase the yearly minimum hereinabove required unless at the option of the Appalachian Company."

Then follow certain provisions as to the right of the Appalachian Company to use the tracks provided, and the rental thereof. Section 7 of the contract provided that, "if the Appalachian Company shall fail to pay the royalties within sixty days, the Improvement Company might terminate all rights of the Appalachian Company, and declare the agreement void, and take possession of the leased premises," and that thereupon the Improvement Company might recover from the Appalachian Company the royalties due and accrued up to the date of the surrender of the leased premises, and that all the improvements put by the Appalachian Company upon the land should be subject to the landlord's lien for rental in behalf of the Improvement Company, and in addition thereto to a contract lien hereby created in behalf of the Improvement Company and the Railroad Company for the amounts due them, respectively, and for enforcing payment of the same. Further provisions of the contract were as follows:

"It is understood and agreed that, out of the royalties and rentals to become due in any year by the Appalachian Company under this contract, either to the Improvement Company or the Railroad Company, such portions of each or both as may be necessary to pay off and discharge any interest then due and unpaid, or about to become due, on the $500,000 mortgage bonds of the Improvement Company secured by its mortgage to the Louisville Trust Company, trustee, dated February 1, 1892, recorded in the Bell county, Kentucky, clerk's office, in Deed Book No. 27, pages ——, may be paid by the Appalachian Company for account of the Improvement Company to said Trust Company, to be applied by it to the payment and discharge of said interest of the Improvement Company."

The fourteenth clause of the lease was as follows:

"If the Improvement Company and Railroad Company shall fail to construct or cause to be constructed the railroad herein provided for, or at any time shall fail, for sixty days after notice and demand, to give to said Appalachian Company the use of said railroad as herein stipulated for, and as stipulated in the railroad contract of even date herewith, the Appalachian Company shall have the right to cancel this lease from that date."

The court below found that the defendant, the Appalachian Company, took possession of the leased lands about November 1, 1892, and continued to hold the property under the lease until April 20, 1894, when the defendant assumed to terminate the lease under the fourteenth clause of the contract referred to; that Mines A and B, which had been opened by the Improvement Company before the lease was made to the Appalachian Company, were not in good workable condition as guarantied in the contract; that the defendant, the Appalachian Company, was not able to mine the minimum amount of coal of 250,000 tons per annum from said mines within the first year, but that the said company could have mined much more than it did mine within the first year of the lease; that the extension of the railroad up the Right Fork of Straight creek, opposite the opening of Mine C, would have enabled defendant to have mined, with proper exertion and skill, the minimum amount of coal required by the contract; that the defendant, after January 1, 1893, had to expend on Mines A and B, to make them workable under the guaranty, $3,500; and that the defendant expended, at the openings and inclines of Mine C, proper for mining, an extension of the railroad to that point, of $5,000. The

court below held that the covenant by the Improvement Company that the Railroad Company would extend its lines as provided in the contract was a covenant independent of the covenant to pay the minimum royalty, and was not a condition precedent, and that, for a breach thereof, the defendant was entitled to damages which might be set off against the minimum royalty or rent accruing to the plaintiff under the contract; that, after estimating and deducting the damages caused by the failure to construct the railroad as agreed, and by the breach of the agreement to deliver the existing mines in a workable condition, the amount due from the plaintiff to the defendant as minimum royalties from the time of taking possession in November, 1892, until April 28, 1894, when defendant canceled the lease and delivered up possession, was $27,137.56.

Helm & Bruce, for plaintiff in error.

Richards, Weissinger & Baskin, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and HAMMOND, J.

TAFT, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The Appalachian Company, the plaintiff in error and the defendant below, files but three assignments of error. The first two are practically the same. They question the correctness of the ruling of the trial court that the covenant by the Improvement Company that the Railroad Company would construct the railroad as therein specified was an independent covenant, and not a dependent covenant, and a condition precedent to the payment of the minimum royalty under the contract of lease. No argument has been addressed to the court in support of the third assignment of error, and it must therefore be regarded as waived. Chamois Co. v. Williamson (decided by this court at the present term) 18 C. C. A. 662, 72 Fed. 508. In their reply brief, counsel for the plaintiff in error seek to raise other questions; but, as no assignments of error embracing them have been filed, they will not be considered.

The only question before us, then, is whether the covenant by the Improvement Company that the Railroad Company would construct the railroad in the manner provided in the contract was a condition precedent to the payment of the minimum royalty under the lease. The learned district judge held that it was not, and we entirely concur with him. The lease was dated in October, 1892, and possession was taken under it in November following. The railroad extension up to Mine C was not to be completed until six months after a demand by the Appalachian Company, the railroad extending to the mouth of Long Branch was not to be completed before the 1st of January, 1894, and the railroad from Long Branch to Sim's Fork was not to be completed until six months thereafter; while the agreement to pay a minimum royalty began with the beginning of the lease, and the first royalty under the lease was due on the 31st of December, 1892. This was three months before it would have been necessary for the Improvement Company and the Railroad Company to have built the first extension of the railroad provided in the contract, even if demand had been made for it as soon as the Appalachian Company went into possession. The royalty for a year and a quarter would be due before the Long Branch extension had to be built, and the royalty for a year and three quarters would be due

before the Sim's Fork extension had to be built under the contract. It is impossible, under such circumstances, that the covenant to pay the royalty and the covenant that the railroad should be extended were interdependent. The Appalachian Company protected itself in the contract by the provision of the contract that if the road was not extended it might terminate the lease. It did not exercise this privilege for nearly a year after a default on the part of the Improvement Company and the Railroad Company to build the first extension. All this time it remained in possession of the property and did coal mining. It is immaterial whether it was possible to mine the minimum amount of coal as provided in the contract without the railroad or not. If the Appalachian Company had intended to make its payment of the minimum royalty dependent on the construction of the railroad, it should have insisted on the presence of such a clause in the contract. It manifestly did not have this intention, because several installments of the royalty were due before all the contemplated extensions of the railroad could be completed. The Appalachian Company had possession of the property of the Improvement Company, and did mining thereon for nearly a year and a half. It would be an unjust construction of the contract that would permit the lessee to have so much of the benefit moving to it under the contract without paying anything therefor. Especially is this true when the Appalachian Company had the right to terminate the lease and its liability under it in May or June of 1893, and yet failed to do so, and continued in possession for nearly a year thereafter.

Rules for determining whether covenants are dependent or independent are like rules for construing wills. They are merely aids in ascertaining the intention of the minds of those who execute the instruments. Often the intention is so clear that rules are of no service. Such is the case at bar; but, as extended reference has been made to the authorities upon the briefs of counsel, it is proper that we should shortly discuss them. The covenant to build the railroad in this lease of mining rights cannot be distinguished from a covenant of a landlord to improve or repair leased premises at some time after the date when by the terms of the lease possession begins. In such a case, the authorities are uniform that a breach of the covenant to repair or improve is no defense to an action for rent under the lease. Lunn v. Gage, 37 Ill. 19; McCullough v. Cox, 6 Barb. 386; McDowell v. Hendrix, 67 Ind. 513; Wright v. Lattin, 38 Ill. 293; Hunt v. Silk, 5 East, 149; Tayl. Landl. & Ten. §§ 265, 275. The same result must be reached in the case at bar by following either of two of the rules which Sergeant Williams lays down in his notes to the case of Pordage v. Cole, 1 Saund. 319, 320, for determining whether covenants are dependent or independent. The first of these rules is as follows:

"If a day be appointed for payment of money, or part of it, or for doing any other act, and the day is to happen or may happen before the thing which is the consideration of the money or other act is to be performed, an action may be brought for the money, or for not doing such other act before performance; for it appears that the party relied upon his remedy, and did not intend to make the performance a condition precedent. And so where

no time is fixed for performance of that which is the consideration of the money or other act."

As already explained, in the case before us, part of the minimum royalty was due under the contract before any of the new railroad track was built. Two semiyearly payments were due before the rest of the railroad extensions were to be completed. Hence it is plain that the Appalachian Company was relying upon its remedies on the covenant to secure its enforcement, and one of these was, in this case, a cancellation of the contract.

Sergeant Williams' third rule is as follows:

"Where a covenant goes only to part of the consideration on both sides, and a breach of such covenant may be paid for in damages, it is an independent covenant; and an action may be maintained for a breach of the covenant on the part of the defendant without averring performance in the declaration."

And the learned annotator, after citing a number of cases to sustain the rule thus stated, gives the reason for it as follows:

"Hence it appears that the reason of the decision in these and other similar cases, besides the inequality of damages, seems to be that where a person has received a part of the consideration for which he entered into the agreement, it would be unjust that, because he has not had the whole, he should therefore be permitted to enjoy that part without either paying or doing anything for it. Therefore the law obliges him to perform the agreement on his part, and leaves him to his remedy to recover any damage he may have sustained in not having received the whole consideration,"—citing Boone v. Eyre, 2 W. Bl. 1312; 1 H. Bl. 273; Campbell v. Jones, 6 Term R. 570; Duke of St. Albans v. Shore, 1 H. Bl. 279.

In the case before us the minimum royalty was to be paid, not only for the coal taken from the mines to be reached by the railroad extensions, but also, and in much greater part, for the coal taken from Mines A and B, which already had railroad connection. We have already alluded to the injustice of a construction which would permit the Appalachian Company to have all the coal mined or which might have been mined from A and B, amounting to 750 tons a day, for nothing. The principle announced in Sergeant Williams' third rule finds illustrations in Lord Ellenborough's judgment in Hunt v. Silk, 5 East, 449, in Lyon v. Bertram, 20 How. 154, in Payne v. Bettisworth, 2 A. K. Marsh. 429, and in Nelson v. Oren, 41 Ill. 18.

The cases of Hoare v. Rennie, 5 Hurl. & N. 19, and Norrington v. Wright, 115 U. S. 188, 6 Sup. Ct. 12, relied on by plaintiff in error, have nothing in them conflicting with the construction placed by us on this lease. They were cases of mercantile contracts for the delivery of merchandise in monthly installments, and a failure by the vendor to deliver an installment in the time and manner prescribed was held the breach of a condition precedent, entitling the other party to rescind. Their ratio decidendi is shown by the opening words of Mr. Justice Gray in delivering the opinion of the court in the latter case. He said:

"In contracts of merchants time is of the essence. The time of shipment is the usual and convenient means of fixing the probable time of arrival, with a view of providing funds to pay for the goods, or of fulfilling contracts with third persons. A statement descriptive of the subject-matter, or of some material incident, such as the time or place of shipment, is ordinarily to be regarded as a warranty, in the sense in which that term is used in insurance and mari-

time law; that is to say, a condition precedent, upon the failure or nonperformance of which the party aggrieved may repudiate the whole contract."

It will be seen that cases of this class rest on the exigencies of mercantile business, and, like warranties in maritime insurance, are based ultimately on custom and usage. But, conceding to these decisions all the effect claimed for them, there is nothing in them from which it can be inferred that the vendee can avoid payment of the contract price for the installments already received and used by him; and yet that is, in reality, what the Appalachian Company seeks to do here.

The judgment of the circuit court is affirmed.