UNION PAC. RY. CO. v. TRAVELERS' INS. CO.

(Circuit Court of Appeals, Eighth Circuit. November 15, 1897.)

No. 874.

CONTRACT—CONSTRUCTION—MEASURE OF DAMAGES FOR BREACH.

A railroad company leased to another ground at a station on which the lessee contracted to erect a building 152 feet long, 42 feet wide, and two stories high, in which he agreed to furnish the company rooms for station purposes, and to maintain a first-class hotel. The company covenanted not to permit the use of its other property to the injury of the hotel, and that it would stop all its passenger trains passing at seasonable hours for meals a sufficient time to allow the passengers to take meals. The contract was observed by both parties for 15 years, during which time the lessee had increased the capacity of the hotel until it contained 55 sleeping rooms. After that time the company ceased to stop the only passenger train passing at a seasonable hour for meals a sufficient length of time for the passengers to take meals. *Held*, that the agreement to stop the trains did not go to the whole consideration of the contract, so as to entitle the lessee on its breach to recover as for a total breach of the entire contract, but was only an incidental promise, and the measure of the lessee's recovery was the diminution in the earnings of the hotel caused thereby between the time of the breach and the bringing of suit.

In Error to the Circuit Court of the United States for the District of Kansas.

Action by the Travelers' Insurance Company against the Union Pacific Railway Company. From a judgment for plaintiff, defendant brings error.

This writ of error was sued out to reverse a judgment for $40,000, which was rendered against the Union Pacific Railway Company, the plaintiff in error, for the breach of a covenant in a lease to stop its passenger trains which passed the leased premises at seasonable hours for meals a sufficient time to permit passengers to take their meals at an hotel built on the premises by the lessee. The lease was made on September 1, 1875. The first breach occurred in June, 1891. This action was commenced on July 1, 1892. In the petition damages for the loss of profits between June 1, 1891, and July 1, 1892, were demanded, but at the trial the attempt to recover these profits was abandoned, and the defendant in error claimed to recover the value of the hotel and other buildings on the leased premises as for an entire breach of the contract. The case was tried by a referee, whose findings of fact and conclusions of law were adopted by the court. The findings disclose these facts: On September 1, 1875, the Kansas Pacific Railway Company made the lease in suit to T. C. Henry. The plaintiff in error succeeded to the rights and assumed the obligations of the lessor, and the Travelers' Insurance Company, the defendant in error, succeeded to the rights and assumed the liabilities of the lessee before June 1, 1889. By the terms of the contract the railway company leased to Henry for the term of 15 years, with the perpetual right of renewal for terms of 10 years, unless the company purchased the improvements at an appraised value, a tract of land 215 feet long and 110 feet wide, situated between the railroad of the company and one of the streets of Abilene, in the state of Kansas. It covenanted to pay the expenses of putting down all platforms around a building which Henry agreed to construct on the premises for an hotel and depot, to pay for awnings over these platforms, to paint the awnings, and to keep them in good repair. It agreed to stop all passenger trains which should pass Abilene at seasonable hours for meals at the hotel on the premises a sufficient time to allow the passengers to take their meals. It covenanted that Henry should have the right to charge and receive reasonable rent from any other railroad company which should occupy the depot, and it agreed not to permit the use of any of the property then or thereafter owned

or held by it in Abilene so as to injure the hotel or its business. On the other hand, Henry agreed to erect a building 152 feet long, 42 feet wide, and 2 stories high before December 3, 1875, to be used for depot and hotel purposes, to provide therein a waiting room, ticket office, telegraph office, and baggage room suitable for railroad accommodations, to keep in this building a first-class hotel, and to sell the depot and hotel to the company at any time after five years, at an appraised value, if the company should desire to buy, and should give notice of its intention six months before the purchase. The lease provided that, if the lessee broke his covenant to keep a first-class hotel, the company might cease to comply with its covenants to stop its trains for meals, to repair the platforms and awnings, and to refuse to permit the use of its lands to the injury of the business of the hotel, might continue to use the passenger and baggage rooms and the ticket office, and might submit the rights of the parties to arbitration. The lease contained no provision relative to the effect of the breach of any other covenant which it contained. The ? see built an hotel and depot on the premises in 1875, within the time fixed in the lease. It contained twenty sleeping rooms, was adapted for general hotel purposes as well as for a railway eating house, and was within two blocks of the business center of Abilene. The railroad company occupied the passenger and baggage rooms and the ticket office, and the lessee the remainder of the building. It has ever since been, and still is, the only first-class hotel in Abilene; and it has always been, and still is, used by the lessee as such. This building cost $30,000 in 1875. Prior to April 14, 1877, the lessee added a third story to the hotel, for the purpose of providing it with additional sleeping rooms, and built a two-story brick office building upon the leased premises, fronting on a principal street. On that day a supplemental contract was made to the effect that these improvements should be treated as though they had been a part of the original building. At some time after April 4, 1887, the lessee spent $12,000 in making further improvements upon the property. None of the improvements made subsequent to the original construction were necessary for the purpose of furnishing meals to passengers. The office building has been, since a time anterior to the commencement of this action, and still is, occupied by the Kansas Farm Mortgage Company as a tenant of the lessee. The railway company leased the hotel from the insurance company for $2,000 per annum from June 1, 1889, to June 1, 1890, when it surrendered possession to the insurance company. Train No. 8 of the railway company passed the hotel at a seasonable hour for dinner during all the time here in question. Prior to March 20, 1890, it stopped there daily a sufficient time for passengers to take their meals. On March 20, 1890, the railway company for the first time put a dining car on this train, and has since operated it with the train. From that time until the railway company surrendered the hotel to the insurance company that train did not stop at Abilene for meals. Shortly before June 1, 1891, when the insurance company retook the hotel, it demanded that the train should stop for meals, and the railway company directed its trainmen to stop the train 15 minutes to allow the passengers to take their meals; but the order was not enforced, and, while the train stopped at the hotel, it usually stopped less than 10 minutes. Nevertheless passengers went into the dining room of the hotel, obtained their dinners, and paid for them, on 178 of the 395 days which intervened between May 31, 1891, and the commencement of this suit, and many other passengers from this train availed themselves of the privileges of a lunch counter which the lessee maintained. Since the commencement of the suit the insurance company has furnished dinners to passengers on this train, has continued to occupy and operate the hotel and to rent the office building, and it has always insisted upon a strict performance of the covenants made by the lessor in the lease. The plaintiff in error denied in its answer that it had broken its covenant to stop its train at Abilene a sufficient time to allow the passengers to take their meals, and introduced evidence tending to sustain its defense, but that defense failed, and the court found that there was a breach of the covenant. The operation of dining cars, and the failure to stop train No. 8 a reasonable time, depreciated the value of the buildings on the leased premises, and destroyed their rental value. If the train had stopped daily a proper length of time, and no dining car had been run upon it, the rental value of the property would

have been $2,000 per annum. Whether or not it would have had any rental value if the train had been stopped a proper length of time, and the dining car had been operated, is not found. The buildings had no market value, but the court found that it appeared from their cost and their rental value that they were worth $40,000. As conclusions of law the court found that the use of dining cars was no breach of the contract, but that the failure to stop train No. 8 a sufficient time to allow the passengers to take their dinners constituted such a breach, and that the value of the improvements on the leased premises —$40,000—was the measure of the damages caused by this breach.

N. H. Loomis (W. R. Kelly, A. L. Williams, and R. W. Blair, on the brief), for plaintiff in error.

John H. Mahan and J. E. McKeighan, for defendant in error.

Before BREWER, Circuit Justice, and SANBORN and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The proposition that the measure of damages for the continued breach for 11 months of a covenant in a lease, which had been carefully kept for 15 years, to stop trains which arrived at seasonable hours at an hotel on the leased premises for meals, is the value of the hotel, is sufficiently startling to arrest attention at least, and to excite some degree of curiosity to learn upon what theory the skill and ingenuity of counsel have thus far maintained it. Their contention is: First, that the covenants of the lessor to stop its trains at the hotel for meals, and not to permit the use of its property in Abilene to injure the business of the hotel, and the covenant of the lessee to keep a first-class hotel, with accommodations for meals for passengers and guests, were mutually dependent covenants, each of which went to the whole consideration of the contract; second, that the continuing breach of these covenants by the lessor for 11 months gave to the lessee the right to recover damages as for a total breach of the entire contract; and, third, that the lessee was entitled to recover whatever it had expended in preparing to fulfill its part of the contract, which they claim was much more than the estimated value of the hotel. Let us consider these propositions in their order.

1. The intention of the parties in this case, as in all cases of the interpretation of contracts, must determine whether the covenants of the lease were dependent or independent, and that intention must be ascertained from the contract itself by the application of common sense to its interpretation in view of the situation of the parties when it was made, and from the construction which they gave to it by their subsequent words and deeds before any controversy had arisen concerning it. The approved test for the determination of this question is found in the rule which Lord Mansfield stated in Boone v. Eyre, 1 H. Bl. 273, in these words:

"Where mutual covenants go to the whole of the consideration on both sides, they are mutual conditions, the one precedent to the other. But where they only go to a part, where a breach may be paid for in damages, there the defendant has a remedy on his covenant, and shall not plead it as a condition precedent." Ritchie v. Atkinson, 10 East, 295; Stavers v. Curling, 3 Bing. N. C. 355; Lowber v. Bangs, 2 Wall. 728, 736; Hague v. Ahrens, 3 U. S. App. 231, 3 C. C. A. 426, and 53 Fed. 58.

The breach of a covenant of the first class—a dependent covenant, which goes to the whole consideration of the contract—gives to the injured party the right to treat the entire contract as broken, and to recover damages for a total breach. Leopold v. Salkey, 89 Ill. 412; Keck v. Bieber (Pa. Sup.) 24 Atl. 170; Parker v. Russell, 133 Mass. 74; Railroad Co. v. Van Deusen, 29 Mich. 431; Richmond v. Railroad Co., 40 Iowa, 264, 275. But a breach of a covenant of the second class—a covenant which does not go to the whole consideration of the contract, and is subordinate and incidental to its main purpose—does not constitute a breach of the entire contract, or put an end to the agreement, but the injured party is still bound to perform his part of the contract, and the only damages he can recover consist in the dif-ᵢ rence between the amount which he actually received or lost, and the amount which he would have received or lost if the broken covenant had been kept. Pordage v. Cole, 1 Saund. 320, note; Campbell v. Jones, 6 Term R. 570, 573; Surplice v. Farnsworth, 7 Man. & G. 576, 584; Obermyer v. Nichols, 6 Bin. 159, 160, 164; Burnes v. McCubbin, 3 Kan. 221, 226; Butler v. Manny, 52 Mo. 497, 506; Turner v. Mellier, 59 Mo. 527, 536; Pepper v. Haight, 20 Barb. 429, 440; Appalachian Co. v. Buchanan, 43 U. S. App. 265, 20 C. C. A. 33, and 73 Fed. 1007. Illustrations of the first class of covenants are found in contracts for personal services, such as that in Leopold v. Salkey, supra, in which one agreed to devote his entire time and skill to the business of his employer for three years, and it was held that he made a breach of his entire contract by absenting himself for two months in the busiest season. Covenants to support the grantors of land during their natural lives in consideration of the conveyances—like that in Parker v. Russell, supra, where it was held that the failure to furnish any support under such a covenant for two years constituted a total breach of the entire agreement—furnish a class of familiar illustrations of this rule many of which may be found in the reports of the New England states. Mullaly v. Austin, 97 Mass. 30; Amos v. Oakley, 131 Mass. 413; Remelee v. Hall, 31 Vt. 582; Fales v. Hemenway, 64 Me. 373; Sutherland v. Wyer, 67 Me. 64; Lamoreaux v. Rolfe, 36 N. H. 33. The promise to pay in installments for work as it progressed was held to be of this character in Railroad Co. v. Van Deusen, supra, where persistent and repeated refusals and failures to pay the installments when due according to the terms of a grading contract were declared to give the contractor the right to abandon the work, and to recover his damages for a breach of the entire agreement. In Richmond v. Railroad Co., supra, the case upon which counsel for the defendant in error seem to place their chief reliance to sustain this judgment, the supreme court of Iowa held that a covenant by a railroad company to deliver to a lessee, which had built an elevator for the purpose of handling grain, all the through grain passing over the railroad, went to the whole consideration of that lease, and that its breach authorized the lessee to recover for a total breach of the entire contract. In that case the railroad company leased a portion of its right of way on the bank of the Mississippi river at Dubuque to the assignor of Richmond & Jackson for the term of 15 years for use as the site for an elevator, and covenanted to give to the lessee the handling of all

its through grain, and to pay to it one cent a bushel and certain storage charges therefor. The lessee agreed to build and operate the elevator, and either to sell its building, or take another lease for 15 years, at the option of the railroad company, at the end of the term. The lease was made in 1860. The railroad company had no bridge across the Mississippi river at Dubuque at that time, and it was necessary to handle its through grain by means of an elevator. The elevator was erected at the terminus of the railroad on the west bank of the river and was suitably located and equipped to transfer grain to and from cars on the railroad track and boats and barges on the river. About 1867 another railroad company leased the railroad of the lessor, and assumed its obligations under the lease to the elevator company. A bridge was built across the river, and from that time forward the lessor used this bridge, and refused to pass its grain through the elevator. Richmond & Jackson, the assignees of the lessee, sued the lessor and its assignee, and recovered a judgment for $4,365.12 for failure to give them the handling of the through grain between October 1, 1867, and January 23, 1868. 26 Iowa, 191. They sued again, and recovered $73,136 for the breach of this covenant between January 23, 1868, and May 1, 1870, 33 Iowa, 422. On February 3, 1872, they brought another suit for a total breach of the entire contract, and in that action they proved and recovered the value of their elevator, which had been rendered useless by the failure of the railroad company to deliver the grain to it. This Iowa case is cited as analogous to the action under consideration, and as persuasive authority in support of the judgment in hand. But the difference between that case and the one at bar is striking and fundamental. In the Iowa case the elevator was built— the entire improvement was made—for the purpose of handling grain, which the railroad company was to furnish, and for whose handling it was to pay, and the failure to furnish the grain and pay for its handling went to the whole consideration of the contract. In the case in hand, the furnishing of dinners daily to the passengers on a single passenger train (the only passenger train that ever passed Abilene regularly at a seasonable hour for a meal) could not have been the only important purpose or the whole consideration for the erection of the three-story hotel with 55 sleeping rooms, and the two-story brick office building, whose value is charged up to the railroad company in this judgment. Indeed, the court below expressly finds that neither the addition of the third story, the construction of the office building, nor the subsequent improvements on these buildings, which cost $12,000, were necessary for the purpose of furnishing meals to passengers, and yet they constitute a large part of the value of the buildings evidenced by the judgment. If furnishing dinners to passengers upon this single train had been the whole consideration of this lease, $3,000 expended in a railroad eating house would have furnished every facility for dining them that an expenditure of 10 or 20 times that amount could provide. Moreover, it was conceded in the Iowa case that the railroad company had committed a total breach of the contract (40 Iowa, 275), while in the case at bar the railway company has constantly insisted, not only that there was not any breach of the entire contract, but that there was no breach

of the covenant to stop the trains; and, after a prolonged and expensive litigation, the only breach found by the court below is that, although the company stopped its train No. 8 for a time on each day, it did not stop it long enough daily during 11 months to properly keep its covenant in that regard. The differences between the facts in the Iowa case and those in the case at bar are so wide and marked that the decision of the one is no authority for, and very little assistance in the decision of, the other.

The cases we have been reviewing are the leading authorities cited by the counsel for the defendant in error in support of their first contention. They are cases in which the covenants upon which they were brought went to the whole consideration of the contract; cases i. which the failure to perform the covenants in suit deprived the plaintiffs of the chief or the entire value of the contracts, and rendered their further existence useless to them. Thus the entire consideration for an agreement to pay for personal services is the covenant to devote the skill and ability of the employed to the service; the whole consideration for the conveyance of a farm for the support of the grantor is the covenant of the grantee to furnish that support; the entire consideration for the performance of a contract of grading, which is to be paid for in money, is the promise to pay money; and the real consideration for the erection and maintenance of the elevator at Dubuque was the covenant of the railroad company to furnish grain for it to handle, and to pay for its handling.

Perhaps we have examined this class of cases with sufficient care, and we turn to a consideration of cases involving the breach of independent covenants which do not go to the whole consideration of the contract, but are subordinate and incidental to its main purpose. The remedy for the breach of such covenants is compensatory damages for the profits lost or the injuries sustained during the continuance of the breach prior to the commencement of the action. It does not avoid or put an end to the contract, nor does it authorize the recovery of damages for its total breach. Thus, in Surplice v. Farnsworth, supra, it was held that a tenant could not quit the premises, and defend against the rent reserved in the lease, because the lessor broke his covenant to repair. In Obermyer v. Nichols, 6 Bin. 159, 160, 169, 171, Nichols had leased a mill to Obermyer for four years, and covenanted in the lease to build a house adjoining the mill, and to make certain improvements after the commencement of the term. The tenant took possession, and the lessor broke his covenants. The learned judge who delivered the opinion of the supreme court of Pennsylvania said:

"I entirely agree with the charge of the court below, that the defendant in that suit, having enjoyed the mill and premises demised, the covenants on the part of the landlord were minor and subordinate, and did not go to the essence of the contract, so as to defeat the rent in toto, in case they were not performed; but that the jury were at liberty to defalk in damages from the rent whatever they might think just and conscientious for the repairs neglected to have been made. Where a covenant goes only to part of the consideration on both sides, and a breach of such covenant may be paid for in damages, it is an independent covenant."

To the same effect are McCullough v. Cox, 6 Barb. 386, 390, where the lease contained a covenant by the lessor to make improvements in a store, and to introduce water; Burnes v. McCubbin, 3 Kan. 221, 226, where the lease contained a covenant, broken by the lessee, not to assign; and the other cases cited in this class in the earlier part of this opinion. It seems unnecessary to review the cases of this class further, and it is not difficult now, in the light of the principles and authorities to which we have referred, to determine to which class of covenants the promise of the railroad company in the lease in suit to stop its trains at the hotel for meals belonged. The situation of the parties when the contract was made, and the terms of the lease itself, disclose the evident intention of the railroad company to obtain depot accommodations, and of the lessee, Henry, to obtain the site for a first-class hotel within two blocks of the center of the city of Abilene, fronting upon a principal street upon one side and upon the railroad upon the other. By the first article of the lease, Henry secured the use of this site for 15 years, and by the second article the railroad company secured in return the use of a passenger room, baggage room, telegraph office, and ticket office for the same length of time. The other provisions of the lease follow those which secure these controlling considerations, and are made by its very terms minor, subordinate, and incidental to them. The lease contains covenants that the lessor shall paint the awnings, and keep them and the platforms in repair, that it shall stop its passenger trains for meals, that the lessee may rent depot accommodations to other railroad companies, that the lessor will not permit the use of its property in Abilene to injure the business of the hotel, and that the lessee shall keep a first-class hotel, with accommodations for passengers and guests; and then it expressly provides that, if the lessee fails to keep a first-class hotel, the lessor may withdraw the advantages covenanted to him in regard to the repair of awnings and platforms, the stopping of trains for meals, and the use of the railroad property, but it leaves the possession of the hotel by the lessee and the use of the depot accommodations by the railroad company—it leaves the controlling considerations of the contract—unaffected by the cessation of the performance of all these incidental covenants. It is difficult to conceive of more conclusive evidence of the intention of these parties that these covenants should be subordinate to, and independent of, the lease of the hotel site to Henry, and the release of the depot accommodations to the railroad company, than this express provision of the lease. Moreover, the character of the structure which the lessee agreed to build is a very persuasive indication that the chief consideration for its construction was not the covenant of the company to stop its train No. 8 to enable the passengers upon it to take dinner. It was 152 feet long and 42 feet wide. It contained 20 sleeping rooms, and cost $30,000. It is too severe a strain upon credulity to believe that the entire or chief consideration for the construction of such a building was the covenant of the railway company that it would stop its train No. 8 daily at this hotel a sufficient length of time to enable passengers to take their dinner.

Nor can it be possible that the lessee was induced by that covenant to put the third story on his hotel, and to build the two-story brick office building which he constructed in subsequent years, for it is expressly found by the court below that these were entirely unnecessary to enable him to dine the passengers. The result is that the contract itself, the situation of the parties when they made it, and their acts under it, all urge with compelling force to the conclusion that the covenant to stop the trains for meals did not go to the whole, or to the chief part, of the consideration for the lease, but was a minor and incidental promise, whose violation could not constitute a total breach of the entire contract. It follows that the true measure of damages in this case was the difference between the amount which the lessee earned between June 1, 1891, and July 1, 1892, from the operation of its hotel, and the amount which it would have earned if the contract in suit had been fully performed by the plaintiff in error, and the rule applied by the court was erroneous.

The objection urged by counsel for defendant in error to this rule of damages—that it is impossible under it to prove any damages, and that the defendant in error ought not to go remediless—has not escaped attention. We are, however, of the opinion from a careful inspection of the evidence in the record, that it is neither impossible nor impracticable to produce such evidence as will sustain a finding of the amount of these damages by a jury or by the court. Moreover, if we are mistaken in this, we are unwilling to assent to the proposition that, if an injured party can prove no damages according to the true rule, he may recover $40,000 under an erroneous rule.

The conclusion which we have reached renders it unnecessary to consider the question whether or not the use of dining cars was a breach of any of the covenants of the lease, because the true measure of damages would be the same in this case whether it was or was not, and the case must be reversed in any event because of the erroneous measure which was applied.

It is likewise unnecessary to consider the second and third propositions stated in the opening of this opinion as the contentions of counsel for defendant in error. The overthrow of their first proposition is fatal to this judgment, whether the second or third could be sustained or not. It may be remarked in passing, however, that it is possible that the plaintiff in error, now that it is settled by this litigation that it must stop its passenger train No. 8 for 20 minutes daily at the Abilene Hotel to permit its passengers to take their dinner, will comply with its covenant, and that it will appear upon the subsequent trial that there was no intention on its part to persistently violate its agreement, but that the litigation resulted from an honest difference of opinion as to the time and manner of its performance. It may be well to note also that, if the rule invoked by the defendant in error that the injured party is entitled to recover whatever he has expended in preparing to fulfill his part of a contract were applicable to this case, there could be no recovery under the breach alleged for the expenditures for the third story of the hotel, and for the brick office building, or for the $12,000 subsequently

expended, nor for the entire value of the building, which includes as one of its elements the improvements made by these expenditures, because it is certain that these improvements were not necessary to enable the lessees to furnish dinners to the passengers, or to enable them to perform their part of the contract, and they were not made to prepare them to do so, because they were prepared to do so without them. The judgment below must be reversed, with costs, and the case must be remanded to the court below, with directions to grant a new trial; and it is so ordered.